# EXHBIT "A"

# BIDDING PROCEDURES

By Motion filed by Premier Golf Missouri, LLC, the Debtor and Debtor-In-Possession herein (the "Motion"), sought approval of the bidding procedures for the sale of a parcel of undeveloped real property encompassing approximately 38.2 acres located in Clay County, Missouri, and referred to by the Debtor as the "Phase III Property" (hereinafter the "Property").

On November 20, 2009, the United States Bankruptcy Court for the Western District of Missouri, Kansas City entered its Order (the "Bidding Procedures Order") authorizing the Debtor to market the Property through the bidding procedures described below (the "Bidding Procedures") to be employed with respect to the sale of the Property (the "Sale"). The Sale is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court at a hearing under Sections 363 and 365 of the Bankruptcy Code (the "Sale Hearing"). The following bid provisions are designed to facilitate a full and fair process designed to maximize the value of the Property for the benefit of Debtor's estate.

1. **The Auction.**

    (a) <u>Date and Time</u>. Pursuant to these Bidding Procedures an auction of the Property will be held at the United States Courthouse, Courtroom 6B, 400 E. 9th Street, Kansas City, Missouri on **December 8, 2009 at 1:30 p.m.** (the "Auction").

    (b) <u>Highest Bidder</u>. At the Auction the Property will be sold to the highest bidder. The Court shall direct and preside over the Auction. The successful bidder's bid will be approved by the Court at the Sale Hearing to be held immediately following the Auction.

    (c) <u>Qualified Bidders</u>. All potential bidders interested in purchasing the Property must attend the Auction and provide Debtor's counsel with a cashier's check in the amount of $120,000.00 made payable to Dunn & Davison, LLC - Trust Account (the "Earnest Deposit"). Upon submitting the Earnest Deposit to Debtor's counsel, the submitting potential bidder shall become a "Qualified Bidder" and may bid at the Auction. The Earnest Deposit of the highest bidder will be applied to the purchase of the Property. The Earnest Deposit checks shall be deposited into said Trust Account for the "successful bidder" and the "backup bidder and held until closing of the sale. Any and all other Earnest Deposit checks will be returned to the unsuccessful bidders at the end of the Auction. Only Qualified Bidders shall be entitled to make any bids at the Auction.

    (d) <u>Bidding Process - Minimum Bid</u>. All Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each bid will be fully disclosed to all other bidders throughout the entire Auction. The Court may announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make subsequent bids) for conducting the Auction so long as such rules are not inconsistent with these Bidding Procedures. The minimum bid for the Property is $1,000,000.00. Qualified

1

Bidders may then continue to bid in minimum increments of at least $10,000 greater than the previous bid. The Auction shall continue until each Qualified Bidder has had the opportunity to submit an additional bid with full knowledge of the then existing highest bid. At the conclusion of the bidding, the Court shall announce its determination as to the bidder submitting the successful bid, which shall be submitted to the Bankruptcy Court for approval at the Sale Hearing. The successful bidder shall be deemed a party-in-interest with standing to appear and be heard in connection with any motion, hearing, or other proceeding relating to Property. If no party bids the minimum bid of $1 million, then Bank Midwest, N.A. may credit bid in any amount it deems appropriate subject to bankruptcy court approval. If the Bank so credit bids, all other bidders must still open their bidding at no less than $1 million.

(e) **Other Requirements**. The successful bidder must (i) submit evidence of its financial ability to pay the balance of the Purchase Price satisfactory to the Debtor and Bank Midwest, N.A. which holds a first deed of trust on the Property, (ii) disclose any relation with the Debtor, direct or indirect (iii) state definitively that the winning bid is not subject to a financing or due diligence contingency, and (iv) consent to the jurisdiction of the Bankruptcy Court as to all matters relating to the sale process. Any side deal or arrangements with any other bidder or potentially interested party with respect to the Auction or the Property must be disclosed at the time of the submission of the bids. No Qualified Bidder shall be granted any expense reimbursement, breakup fees, topping fees, or any such type of fee or other bid protection in connection with the Auction.

2. **Due Diligence.** Up until the day before the Auction, Debtor will provide any potential bidder such due diligence access to the property or such additional information as may be reasonably requested by the potential bidder with respect to the Property. Debtor will allow any potential bidder access to the Property during normal business hours to inspect or perform an environmental review and conduct such other reviews and inspections of the Property as the potential bidder may deem reasonable and necessary in connection with making a bid for the Property. Potential bidders should provide Debtor with prior notice of the time and date on which the potential bidder plans on inspecting the Property so that a representative of Debtor can be made available to answer any questions the potential bidder may have with respect to the Property. The cost and expense of any and all due diligence performed by a potential bidder shall be at the potential bidder's sole cost and expense.

3. **As is and with all faults.** The Sale shall be on an "AS IS AND WITH ALL FAULTS" basis without representations or warranties of any kind, nature or description by the Debtor, its agents or representatives, except to the extent expressly set forth in the Sale Agreement (as defined below). All of Debtor's right, title and interest in and to the Property shall be sold free and clear of all liens, claims, (and such terms as defined by Section 101(5) of the Bankruptcy Code) encumbrances, rights, remedies, restrictions, interests, liabilities and contractual commitments of any kind or nature whatsoever whether arising before or after the Petition date of the bankruptcy case, whether at law or in equity as more specifically set forth and defined in the proposed order approving the Sale with any such claims and liens to attach the proceeds of the Sale.

4. **Backup Bid.** If for any reason the successful bidder fails to consummate the purchase of the Property, the backup bid will automatically be deemed to be the highest and best bid and treated as the successful bidder. The Debtor shall be authorized to sell the Property to the backup bidder as soon as is reasonable without further order of the Bankruptcy Court as if such bidder were deemed the successful bidder. The backup bidder shall also enter into a Sale Agreement contingent upon the successful bidder not closing. If the successful bidder fails to close by December 22, 2009, then the backup bidder will be sent notice of this event on the following day, December 23, 2009, and backup bidder shall have 10 business days thereafter to close on or before January 8, 2010. If the backup bidder does not close by January 8, 2010 for any reason other than the Debtor's default under the Sale Agreement (as defined below), then the Earnest Deposit of the backup bidder shall also be kept by Debtor as liquidated damages, and Debtor shall have no further obligation to the backup bidder.

5. **Sale Agreement.** The successful bidder (and the backup bidder) must be willing to enter into their respective Real Estate Sale Agreement in the form as attached hereto as Exhibits "1 and "2" (the "Sale Agreement"). Once the successful bidder has been approved by the Bankruptcy Court at the Sale Hearing, then pursuant to the terms of the Sale Agreement, the successful bidder shall close on the Sale by December 22, 2009, and if necessary the backup bidder must close by January 8, 2010.

# EXHIBIT "1"

## REAL ESTATE SALE CONTRACT

THIS REAL ESTATE SALE CONTRACT is entered into on this _____ day of December, 2009, by and between Premier Golf Missouri, LLC, 10310 N. Olive Ave., Kansas City, Missouri 64155 (hereinafter referred to as "Seller") and _____ (hereinafter referred to as "Buyer").

W I T N E S S E T H:

WHEREAS, Seller is selling that certain Property located in Kansas City, Clay County, Missouri, as more particularly described on <u>Exhibit A</u> attached hereto, (the "Property").

WHEREAS, pursuant to the bidding procedures set forth in an Order entered on November 20, 2009 by the Bankruptcy Court for the Western District of Missouri, Buyer was the highest bidder for the Property at an auction held on December 8, 2009. At a hearing held immediately after the auction, the Bankruptcy Court approved Buyer's purchase of the Property free and clear of all liens and claims pursuant to Section 363 of the U.S. Bankruptcy Code.

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller the Property in compliance with the Court's Order on the terms and conditions hereinafter more fully set out.

NOW, THEREFORE, the parties hereto for good and valuable consideration hereby mutually agree as follows:

1.  <u>Purchase of Property</u>. Seller does hereby agree to sell and warrant to Buyer and Buyer does hereby agree to purchase and acquire from Seller upon the terms, conditions and considerations hereinafter stated the Property.

2.  <u>Purchase Price</u>. The purchase price shall be $_____ (the "Purchase Price"). The purchase price shall be paid as follows: (a) An earnest money deposit of $120,000 (the "Earnest Money") which was paid prior to the execution of this Contract and which deposit became non-refundable (other than in the event of Seller's default hereunder) upon the execution of this Contract and (b) the balance paid in cash at Closing by electronic transfer or other immediately available funds. If Buyer does not close by the Closing Date for any reason other than Seller's default under this Agreement, then Seller shall keep Buyer's Earnest Money as liquidated damages and Seller shall have no further obligation to Buyer under this Agreement.

3.  <u>Due Diligence Review</u>. Buyer shall conduct any and all reviews and/or perform any and all appraisals, title reports, surveys, inspections or studies of the Property prior to the execution of this Contract (the "Due Diligence Review"). Seller has provided Buyer and its agents with access to the Property for purposes of appraisals, surveys and inspections. Seller has conducted the Due

1

Diligence Review and desires to purchase the Property in its current condition without any further Due Diligence Review.

4. Earnest Money Deposit. If the sale closes in accordance with the terms of this Contract, the Earnest Money shall be applied against the Purchase Price. If Seller fails to comply with the terms and provisions of this Contract by the Closing Date, then this Contract will automatically terminate and Buyer may obtain the immediate return of the Earnest Money.

5. Title. Pursuant to the Court's Order, fee simple title to the Property is being conveyed by Seller to Buyer free and clear of all liens and claims subject only to those for real estate taxes for the year 2009 and subsequent years, and such exceptions as are of record and required by any applicable zoning ordinance for a residential real estate development.

6. Title Evidence. Buyer shall obtain such title insurance as it deems necessary based on the order approving the sale of the Property entered in the bankruptcy case of the Seller under § 363 of the Bankruptcy Code. The cost of said title insurance will be paid for by the Seller.

7. Closing. The closing of this transaction (the "Closing") shall take place at the offices of the Seller at the address referenced above on or before **December 22, 2009**, or at such other place and time as agreed to by the parties (the "Closing Date"). Possession of the property shall be given to Buyer at closing.

8. Seller's Obligations. On or prior to the Closing Date, Seller shall execute, acknowledge and deliver to Buyer a General Warranty Deed (the Warranty Deed) in recordable form conveying the Property to Buyer, said Warranty Deed conveying marketable fee simple title; and

9. Buyer's Obligations. On the Closing Date, Buyer shall:

(a) Deliver to Seller the purchase price as set forth in above paragraph 2; and

(b) Pay for Buyer's share of the costs and expenses relating to this transaction.

10. New Utility Easements. Seller acknowledges that in order to develop the Property for single family residential real estate lots that Buyer will need Seller to grant utility easements under the Sellers adjacent property (the "Utility Easements"). Accordingly, Seller agrees to execute and deliver to Buyer utility easement agreements to provide the Utility Easements under the Debtor's adjacent Property in such form as is reasonable and necessary to provide residential utility services to the Property (the "Easement Agreements"). The Easement Agreements shall be in the form as attached hereto as Exhibit "B", and shall be recorded at closing along with the Warranty Deed for the Property. Seller shall provide these Easement Agreements at no additional cost to Buyer.

11. Existing Utility Easements. The parties acknowledge that certain easements were recorded with respect to the Property on or about September 5, 2008 (the "September Easements"). Seller and its affiliated entity, Double "O" Development, LLC agree that at Closing Seller and/or Double O Development will file such documents and instruments as are necessary to modify, release and/or otherwise terminate the September Easements to accommodate the Buyer's development plans with such easement releases to be in the form as attached hereto as Exhibit "C" (the "Easement

2

Releases"). The Easement Releases shall include Seller's agreement to move the existing golf cart path off of the Property (with such work for moving the cart path to be completed by March 1, 2010), to cut off and not use the existing underground water line which runs under the Property and re-route a new water line under the Seller's other property. Any and all costs and expenses associated with the Easement Releases under this paragraph 11 shall be at the Buyer's expense.

12. Condition of Property. Buyer acknowledges that the Property and all improvements thereon are being sold "AS IS AND WITH ALL FAULTS". Buyer is purchasing the Property based solely upon Buyer's own independent investigations and inspections of the Property, and not in reliance on any information provided by the Seller or any of Seller's agents or contractors. Seller has made no agreement to alter, repair or improve the Property or to perform any other work with respect to the physical condition or appearance of the Property other than to move the cart path in accordance with above paragraph 11.

13. No Warranties. Seller specifically disclaims any warranty (except warranties as to title contained in Seller's Warranty Deed), guaranty or representation, oral or written, past or present, express or implied, including, but not limited to, any warranty or representation as to the condition, quality, safety, freedom from defects (whether or not detectable by inspection), merchantability, fitness for Buyer's intended use or any other particular purposes, or compliance with zoning or other legal requirements, of all or any part of the Property, or as to the availability or existence of any utility or other governmental or private services. Buyer acknowledges that Buyer has had an opportunity to examine the Property and is purchasing the Property based solely on its own independent investigations and findings and not in reliance on any information provided by Seller.

14. Buyer's Closing Expenses. At the Closing, Buyer shall pay in addition to the Purchase Price the following:

(a) All charges or fees for recording the Warranty Deed, the Deed of Trust and any other mortgage financing documents; and

(b) All escrow fees charged by the Title Company.

15. Other Expenses. Each party shall pay its own attorney's fees.

16. Prorations. At the Closing, prorations and/or payments shall be made in cash, as of the Closing Date, as follows: All real estate taxes for calendar years previous to the calendar year of the Closing Date shall be paid in full by Seller, and real estate taxes for the calendar year of the Closing Date shall be prorated between Buyer and Seller as of the date of Closing. If, on the closing date, real estate assessments or rates for the calendar year of Closing are not fixed, such taxes shall be prorated on the basis of the tax rate and assessment for the previous calendar year, and any discrepancy related to this estimated proration shall be paid or received by Buyer.

17. Time of Essence. Time is of the essence with respect to the provisions of this Contract.

18. Choice of Law. This Contract shall be governed by and construed in accordance with the laws of the State of Missouri.

19. <u>Authority to Bind</u>. Each individual who executes this Agreement on behalf of a party represents that he or she is duly authorized to execute this Agreement on behalf of that party and is operating within the scope of his or her authority.

20. <u>Good Faith</u>. Each party to this Agreement shall use good faith and his or its best efforts to accomplish the actions provided for in this Agreement in due time and to cooperate with all other parties in doing so.

21. <u>Agreement to Terms</u>. Buyer and Seller acknowledge that they have read the entire Agreement and that by signing below agree to all terms contained herein.

IN WITNESS WHEREOF, the parties hereto have executed this Real Estate Sale Contract on the day and year first above written.

**SELLER:**                                                        **BUYER:**

Premier Golf Missouri, LLC


By: _____        _____


Double O Development, LLC executes this Contract to be bound by the provisions of paragraph 11.

                                                              Double O Development, LLC

                                                              By: _____

EXHIBIT "A"
LEGAL DESCRIPTION

A tract of land in the Southwest Quarter of Section 30 and in the Northwest Quarter and Northeast Quarter of Section 31, all in Township 52, Range 32, Kansas City, Clay County, Missouri, being bounded and described as follows: Commencing at the Southeast corner of said Southwest Quarter; thence North 89 degrees 37 minutes 25 seconds West along the South line of said Southwest Quarter, 647.71 feet to a point on the Southerly line of STALEY GOLF COURSE – THIRD PLAT, a subdivision in Kansas City, Clay County, Missouri, said point being the True Point of Beginning of the tract to be herein described; thence North 63 degrees 33 minutes 33 seconds West along said Southerly line, 377.93 feet; thence South 77 degrees 46 minutes 33 seconds West along said Southerly line, 169.96 feet; thence South 86 degrees 56 minutes 33 seconds West along said Southerly line, 90.37 feet; thence South 15 degrees 16 minutes 17 seconds East, 406.59 feet; thence North 77 degrees 13 minutes 17 seconds East, 121.61 feet; thence South 84 degrees 03 minutes 05 seconds East, 100.14 feet; thence South 67 degrees 56 minutes 02 seconds East, 91.05 feet; thence South 53 degrees 32 minutes 53 seconds East, 79.73 feet; thence South 41 degrees 11 minutes 15 seconds East, 81.17 feet; thence South 26 degrees 19 minutes 23 seconds East, 258.82 feet; thence South 67 degrees 32 minutes 25 seconds West, 135.42 feet; thence South 15 degrees 20 minutes 49 seconds East, 153.59 feet; thence South 82 degrees 07 minutes 00 seconds West, 206.87 feet; thence South 05 degrees 18 minutes 09 seconds East, 383.22 feet to a point on the Northerly line of said STALEY GOLF COURSE – THIRD PLAT; thence Easterly, Northerly and Westerly along said line the following courses: thence North 57 degrees 09 minutes 20 seconds East, 153.27 feet; thence North 75 degrees 04 minutes 44 seconds East, 419.46 feet; thence South 83 degrees 07 minutes 47 seconds East, 564.67 feet; thence North 63 degrees 36 minutes 25 seconds East, 165.74 feet; thence North 75 degrees 47 minutes 16 seconds East, 266.31 feet; thence North 73 degrees 24 minutes 33 seconds East, 504.51 feet; thence North 00 degrees 29 minutes 35 seconds East, 329.32 feet; thence South 83 degrees 16 minutes 44 seconds West, 118.24 feet; thence North 85 degrees 25 minutes 14 seconds West, 89.43 feet; thence North 59 degrees 09 minutes 11 seconds West, 320.54 feet; thence North 62 degrees 06 minutes 13 seconds West, 378.52 feet; thence South 86 degrees 11 minutes 50 seconds West, 541.42 feet; thence North 73 degrees 13 minutes 29 seconds West, 70.63 feet; thence North 63 degrees 33 minutes 33 seconds West, 398.49 feet to the True Point of Beginning, and commonly known as part of POD J of the Staley Land Golf Community and consisting of 38 acres more or less.

# EXHIBIT "2"

## REAL ESTATE SALE CONTRACT

### ("Backup Contract")

THIS REAL ESTATE SALE CONTRACT is entered into on this _____ day of December, 2009, by and between Premier Golf Missouri, LLC, 10310 N. Olive Ave., Kansas City, Missouri 64155 (hereinafter referred to as "Seller") and _____ (hereinafter referred to as "Buyer").

W I T N E S S E T H:

WHEREAS, Seller is selling that certain Property located in Kansas City, Clay County, Missouri, as more particularly described on <u>Exhibit A</u> attached hereto, (the "Property").

WHEREAS, pursuant to the bidding procedures set forth in an Order entered on November 20, 2009 by the Bankruptcy Court for the Western District of Missouri, Buyer was the second highest bidder for the Property at an auction held on December 8, 2009 (the "backup bidder") and is signing this Contract pursuant to the terms of below paragraph 22. At a hearing held immediately after the auction, the Bankruptcy Court approved Buyer's purchase of the Property free and clear of all liens and claims pursuant to Section 363 of the U.S. Bankruptcy Code.

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller the Property in compliance with the Court's Order on the terms and conditions hereinafter more fully set out.

NOW, THEREFORE, the parties hereto for good and valuable consideration hereby mutually agree as follows:

1. <u>Purchase of Property</u>. Seller does hereby agree to sell and warrant to Buyer and Buyer does hereby agree to purchase and acquire from Seller upon the terms, conditions and considerations hereinafter stated the Property.

2. <u>Purchase Price</u>. The purchase price shall be $_____ (the "Purchase Price"). The purchase price shall be paid as follows: (a) An earnest money deposit of $120,000 (the "Earnest Money") which was paid prior to the execution of this Contract and which deposit became non-refundable (other than in the event of Seller's default hereunder) upon the execution of this Contract and (b) the balance paid in cash at Closing by electronic transfer or other immediately available funds. If Buyer does not close by the Closing Date for any reason other than Seller's default under this Agreement, then Seller shall keep Buyer's Earnest Money as liquidated damages and Seller shall have no further obligation to Buyer under this Agreement.

3. <u>Due Diligence Review</u>. Buyer shall conduct any and all reviews and/or perform any and all appraisals, title reports, surveys, inspections or studies of the Property prior to the execution

1

of this Contract (the "Due Diligence Review"). Seller has provided Buyer and its agents with access to the Property for purposes of appraisals, surveys and inspections. Seller has conducted the Due Diligence Review and desires to purchase the Property in its current condition without any further Due Diligence Review.

4. <u>Earnest Money Deposit</u>. If the sale closes in accordance with the terms of this Contract, the Earnest Money shall be applied against the Purchase Price. If Seller fails to comply with the terms and provisions of this Contract by the Closing Date, then this Contract will automatically terminate and Buyer may obtain the immediate return of the Earnest Money.

5. <u>Title</u>. Pursuant to the Court's Order, fee simple title to the Property is being conveyed by Seller to Buyer free and clear of all liens and claims subject only to those for real estate taxes for the year 2009 and subsequent years, and such exceptions as are of record and required by any applicable zoning ordinance for a residential real estate development.

6. <u>Title Evidence</u>. Buyer shall obtain such title insurance as it deems necessary based on the order approving the sale of the Property entered in the bankruptcy case of the Seller under § 363 of the Bankruptcy Code. The cost of said title insurance will be paid for by the Seller.

7. <u>Closing</u>. The closing of this transaction (the "Closing") shall take place at the offices of the Seller at the address referenced above on or before **January 8, 2010**, or at such other place and time as agreed to by the parties (the "Closing Date"). Possession of the property shall be given to Buyer at closing.

8. <u>Seller's Obligations</u>. On or prior to the Closing Date, Seller shall execute, acknowledge and deliver to Buyer a General Warranty Deed (the Warranty Deed) in recordable form conveying the Property to Buyer, said Warranty Deed conveying marketable fee simple title; and

9. <u>Buyer's Obligations</u>. On the Closing Date, Buyer shall:

(a) Deliver to Seller the purchase price as set forth in above paragraph 2; and

(b) Pay for Buyer's share of the costs and expenses relating to this transaction.

10. <u>New Utility Easements</u>. Seller acknowledges that in order to develop the Property for single family residential real estate lots that Buyer will need Seller to grant utility easements under the Sellers adjacent property (the "Utility Easements"). Accordingly, Seller agrees to execute and deliver to Buyer utility easement agreements to provide the Utility Easements under the Debtor's adjacent Property in such form as is reasonable and necessary to provide residential utility services to the Property (the "Easement Agreements"). The Easement Agreements shall be in the form as attached hereto as Exhibit "B", and shall be recorded at closing along with the Warranty Deed for the Property. Seller shall provide these Easement Agreements at no additional cost to Buyer.

11. <u>Existing Utility Easements</u>. The parties acknowledge that certain easements were recorded with respect to the Property on or about September 5, 2008 (the "September Easements"). Seller and its affiliated entity, Double "O" Development, LLC agree that at Closing Seller and/or Double O Development will file such documents and instruments as are necessary to modify, release

2

and/or otherwise terminate the September Easements to accommodate the Buyer's development plans with such easement releases to be in the form as attached hereto as Exhibit "C" (the "Easement Releases"). The Easement Releases shall include Seller's agreement to move the existing golf cart path off of the Property (with such work for moving the cart path to be completed by March 1, 2010), to cut off and not use the existing underground water line which runs under the Property and re-route a new water line under the Seller's other property. Any and all costs and expenses associated with the Easement Releases under this paragraph 11 shall be at the Buyer's expense.

12. <u>Condition of Property</u>. Buyer acknowledges that the Property and all improvements thereon are being sold "AS IS AND WITH ALL FAULTS". Buyer is purchasing the Property based solely upon Buyer's own independent investigations and inspections of the Property, and not in reliance on any information provided by the Seller or any of Seller's agents or contractors. Seller has made no agreement to alter, repair or improve the Property or to perform any other work with respect to the physical condition or appearance of the Property other than to move the cart path in accordance with above paragraph 11.

13. <u>No Warranties</u>. Seller specifically disclaims any warranty (except warranties as to title contained in Seller's Warranty Deed), guaranty or representation, oral or written, past or present, express or implied, including, but not limited to, any warranty or representation as to the condition, quality, safety, freedom from defects (whether or not detectable by inspection), merchantability, fitness for Buyer's intended use or any other particular purposes, or compliance with zoning or other legal requirements, of all or any part of the Property, or as to the availability or existence of any utility or other governmental or private services. Buyer acknowledges that Buyer has had an opportunity to examine the Property and is purchasing the Property based solely on its own independent investigations and findings and not in reliance on any information provided by Seller.

14. <u>Buyer's Closing Expenses</u>. At the Closing, Buyer shall pay in addition to the Purchase Price the following:

(a) All charges or fees for recording the Warranty Deed, the Deed of Trust and any other mortgage financing documents; and

(b) All escrow fees charged by the Title Company.

15. <u>Other Expenses</u>. Each party shall pay its own attorney's fees.

16. <u>Prorations</u>. At the Closing, prorations and/or payments shall be made in cash, as of the Closing Date, as follows: All real estate taxes for calendar years previous to the calendar year of the Closing Date shall be paid in full by Seller, and real estate taxes for the calendar year of the Closing Date shall be prorated between Buyer and Seller as of the date of Closing. If, on the closing date, real estate assessments or rates for the calendar year of Closing are not fixed, such taxes shall be prorated on the basis of the tax rate and assessment for the previous calendar year, and any discrepancy related to this estimated proration shall be paid or received by Buyer.

17. <u>Time of Essence</u>. Time is of the essence with respect to the provisions of this Contract.

18.   Choice of Law. This Contract shall be governed by and construed in accordance with the laws of the State of Missouri.

19.   Authority to Bind. Each individual who executes this Agreement on behalf of a party represents that he or she is duly authorized to execute this Agreement on behalf of that party and is operating within the scope of his or her authority.

20.   Good Faith. Each party to this Agreement shall use good faith and his or its best efforts to accomplish the actions provided for in this Agreement in due time and to cooperate with all other parties in doing so.

21.   Agreement to Terms. Buyer and Seller acknowledge that they have read the entire Agreement and that by signing below agree to all terms contained herein.

22.   Backup Bidder. The undersigned Buyer is executing this Contract as the "backup Bidder" under the bidding procedures referenced in second recital paragraph on page 1. Accordingly, Buyer's obligation to close under this Contract is contingent upon the successful bidder defaulting under its separate Contract and not closing on the sale of the Property. If the successful bidder closes on the sale of the Property, then Buyer's obligation hereunder shall automatically terminate and Buyer's Earnest Money shall be immediately returned to Buyer. If the successful bidder does not close, then Buyer must close under this Contract by January 8, 2010 (provided Buyer receives notice in accordance with the bidding procedures that the successful bidder failed to close), or else Buyer's Earnest Money shall be kept by Seller as liquidated damages and Seller shall have no further obligation to Buyer under this Contract.

IN WITNESS WHEREOF, the parties hereto have executed this Real Estate Sale Contract on the day and year first above written.

**SELLER:**                                              **BUYER:**

Premier Golf Missouri, LLC


By: _____         _____


Double O Development, LLC executes this Contract to be bound by the provisions of paragraph 11.

Double O Development, LLC

By: _____

4

# EXHIBIT "A"
## LEGAL DESCRIPTION

A tract of land in the Southwest Quarter of Section 30 and in the Northwest Quarter and Northeast Quarter of Section 31, all in Township 52, Range 32, Kansas City, Clay County, Missouri, being bounded and described as follows: Commencing at the Southeast corner of said Southwest Quarter; thence North 89 degrees 37 minutes 25 seconds West along the South line of said Southwest Quarter, 647.71 feet to a point on the Southerly line of STALEY GOLF COURSE – THIRD PLAT, a subdivision in Kansas City, Clay County, Missouri, said point being the True Point of Beginning of the tract to be herein described; thence North 63 degrees 33 minutes 33 seconds West along said Southerly line, 377.93 feet; thence South 77 degrees 46 minutes 33 seconds West along said Southerly line, 169.96 feet; thence South 86 degrees 56 minutes 33 seconds West along said Southerly line, 90.37 feet; thence South 15 degrees 16 minutes 17 seconds East, 406.59 feet; thence North 77 degrees 13 minutes 17 seconds East, 121.61 feet; thence South 84 degrees 03 minutes 05 seconds East, 100.14 feet; thence South 67 degrees 56 minutes 02 seconds East, 91.05 feet; thence South 53 degrees 32 minutes 53 seconds East, 79.73 feet; thence South 41 degrees 11 minutes 15 seconds East, 81.17 feet; thence South 26 degrees 19 minutes 23 seconds East, 258.82 feet; thence South 67 degrees 32 minutes 25 seconds West, 135.42 feet; thence South 15 degrees 20 minutes 49 seconds East, 153.59 feet; thence South 82 degrees 07 minutes 00 seconds West, 206.87 feet; thence South 05 degrees 18 minutes 09 seconds East, 383.22 feet to a point on the Northerly line of said STALEY GOLF COURSE – THIRD PLAT; thence Easterly, Northerly and Westerly along said line the following courses: thence North 57 degrees 09 minutes 20 seconds East, 153.27 feet; thence North 75 degrees 04 minutes 44 seconds East, 419.46 feet; thence South 83 degrees 07 minutes 47 seconds East, 564.67 feet; thence North 63 degrees 36 minutes 25 seconds East, 165.74 feet; thence North 75 degrees 47 minutes 16 seconds East, 266.31 feet; thence North 73 degrees 24 minutes 33 seconds East, 504.51 feet; thence North 00 degrees 29 minutes 35 seconds East, 329.32 feet; thence South 83 degrees 16 minutes 44 seconds West, 118.24 feet; thence North 85 degrees 25 minutes 14 seconds West, 89.43 feet; thence North 59 degrees 09 minutes 11 seconds West, 320.54 feet; thence North 62 degrees 06 minutes 13 seconds West, 378.52 feet; thence South 86 degrees 11 minutes 50 seconds West, 541.42 feet; thence North 73 degrees 13 minutes 29 seconds West, 70.63 feet; thence North 63 degrees 33 minutes 33 seconds West, 398.49 feet to the True Point of Beginning, and commonly known as part of POD J of the Staley Land Golf Community and consisting of 38 acres more or less.