IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

IN RE:                                            )
                                                  )
PREMIER GOLF MISSOURI, LLC,                       )    Case No. 09-44526
                                                  )
        Debtor.                                   )

MEMORANDUM OPINION
and
ORDER DIRECTING COUNSEL FOR THE DEBTOR
TO SERVE 38 AMEN CORNER, LLC

The purpose of this Memorandum Opinion is to memorialize the reasons for my Order dated December 22, 2009 (Doc. #122), in which I extended the deadline for the closing of the sale of the real estate previously set out in my Order dated December 8, 2009 (Doc. #106) approving the Motion to Approve the Sale of Property Other Than in the Ordinary Course of Business Under 11 U.S.C. § 363 (Doc. #88).

This case involves a residential development and golf course facility known as Staley Farms Golf Club. The Debtor owns and operates the golf course and associated club. Initially, an entity known as Staley Land Company, LLC, intended to purchase and develop the residential tracts of the property in three phases. Staley Land Company is the owner of Phases I and II of the development. At issue here is Phase III, a 38-acre undeveloped tract of land. Staley Land Company claims that it had the option to purchase Phase III, but the purchase of Phase III fell into dispute and became the subject of state court litigation, the details of which are not relevant here.

After the Debtor filed bankruptcy, on December 8, 2009, I approved a motion to sell Phase III to the successful bidder at auction, one Larry Shandy, who subsequently formed an entity known as SF Development, LLC, for purposes of closing the purchase. The backup bidder at auction was an entity known as 38 Amen Corner, LLC. The deadline for SF Development's closing had been set for yesterday, December 22, 2009. If SF Development failed to close by that deadline, then 38 Amen Corner would have ten days thereafter in which to close based on its backup bid. Also on December 8, I granted the Debtor's motion to reject the alleged executory sale contract with Staley Land Company with regard to Phase III (Doc. #119).

On December 18, 2009, the Debtor filed a Motion to Amend my Order granting its motion to reject the alleged executory sale contract with Staley Land Company. In sum, pursuant to the now-rejected sale contract, Staley Land Company allegedly agreed to provide public access to Phase III through the Phase II property. In the Motion to Amend, the Debtor states that it recently discovered that there was a problem with the public access to the property being purchased by SF Development. The Debtor asked, essentially, that I require Staley Land Company to execute a warranty deed relating to an currently-existing access easement, and build a publicly dedicated street on Phase II, thereby granting public access to Phase III which would

be acceptable to the City of Kansas City.

Then, on December 22, yesterday morning, my chambers received telephone calls from at least two of the attorneys involved in the sale transaction, indicating that there may be problems with the closing which was to occur yesterday. Specifically, counsel for the Debtor called as to the status of its Motion to Amend, and counsel for the secured lender on the Phase III property, Bank Midwest, N.A., called to request an emergency transcript of the hearing on the motion to sell the property. As a result, I arranged a conference call, off the record, which included Thomas G. Stoll as counsel for the Debtor, Mark A. Shaiken as counsel for Bank Midwest NA, and Bruce E. Strauss as counsel for Staley Land Company.

Two primary issues were raised during the call. First, Staley Land Company strenuously opposed the Debtor's Motion to Amend the Order rejecting the sale contract for several reasons, including that a debtor should not be permitted to reject a contract, and at the same time attempt to enforce a provision in that contract. The point is well-taken. Hence, the question was whether SF Development, as the buyer of Phase III, was aware of the access problem and whether that would be an impediment to its closing. On that issue, counsel advised that SF Development was represented by attorney John Crossett, who was not then a participant in the conference call.

3

The second issue raised in the call occurred when counsel for Bank Midwest stated that he had received the closing statement on the evening of December 21, and that it showed that, from the sale proceeds, only one million dollars was to be wired to the Bank, and the Debtor was to retain approximately $200,000 of the proceeds. This was in direct contradiction to what his recollection of the statements at the sale hearing had been; rather, his understanding was that the Bank was to receive all net proceeds from the sale (after payment of costs and certain taxes), and the Debtor was to retain none of the proceeds.[1] In response, counsel for the Debtor stated that he believed the Bank was only secured up to a million dollars,[2] and that the Debtor needed the extra proceeds to operate. In sum, I agreed with the Bank's counsel that I had not been advised at the hearing, or in the sale motion considered at that hearing,[3] that the Debtor was to receive *any* funds from the sale closing. I would not likely have approved the sale if I had been so advised. Consequently, I stated that all of the

---

[1] Hence, the Bank's counsel had contacted my Chambers to request an emergency transcript of the sale hearing, one of the calls which prompted the conference call of yesterday morning.

[2] The Bank's claim exceeds $3.8 million.

[3] *Motion to Approve the Sale of Property Other than In the Ordinary Course of Business Under 11 U.S.C. § 363* (Doc. #88). I note that the issue of the Debtor's attempt to retain a portion of the proceeds had been raised previously in the case. In its *Limited Objection to Sale of Real Estate* (Doc. #28), the Bank objected to the Debtor's original attempt to sell the Phase III property to an entity known as SF-38, LLC, on the ground that the Debtor was apparently attempting to retain some of the proceeds rather than paying all net proceeds to the Bank.

net proceeds should go to the Bank at closing and, if there was a dispute as to the limit on the amount of the Bank's security, that issue could be raised at a later date.

Based on all that, I concluded the call and re-convened the parties on a telephone hearing on the record, which included all of the aforementioned attorneys, as well as John Crossett as counsel for SF Development. During that hearing, Mr. Crossett stated that he had been aware of the Debtor's Motion to Amend and that the access problem was not an impediment to his client's closing.

Next, the subject of the closing statement arose again. This time, counsel for Bank Midwest pointed out that the amount allocated to pay real estate taxes from the proceeds was $150,000 which, he thought, was excessive for an undeveloped 38-acre tract and, further, he suspected that the taxes for the golf course tract (which was not part of the property being sold) had been included. In response to this inquiry, counsel for the Debtor stated that he had obtained the tax figure from his client and, he conceded, it probably included the taxes for the golf course. However, he believed that was proper because the Bank also had a (separate) deed of trust on the golf course property and, therefore, it would benefit the Bank to have those taxes paid as well.

As I stated at the hearing, the Debtor's directing the closing agent to use sale proceeds to pay taxes on a tract of property that is not part of the sale, *particularly without informing the Bank or anyone else that they were included*, was clearly

improper. If the Bank wanted those taxes paid from the sale proceeds, that is the Bank's decision.

Thus, as the Bank had now uncovered two highly questionable items to be paid at closing, both of which benefitted the Debtor, I inquired of Debtor's counsel if there was anything else that had not been disclosed. Stating that he had not intended to hide anything from anyone, he confirmed that there was not.

At the conclusion of that hearing, I denied the Debtor's Motion to Amend the Order as to the rejection of the sale contract with Staley Land Company.

Shortly after the conclusion of that hearing, Mr. Crossett contacted my chambers, indicating that there was another problem. Based on his call, I again convened the attorneys on a conference call, this time off the record. At that time, Mr. Crossett advised of two issues: First, his client had advised him after the hearing that the access problem to Phase III was indeed an impediment to SF Development's closing. Second, in light of the fact that gaining access to Phase III would likely involve negotiations with Staley Land Company, Mr. Crossett realized that he has a conflict in representing SF Development. Specifically, he had been hired by Larry Shandy (the successful bidder at the auction) to form SF Development for the purpose of closing the transaction and taking ownership of Phase III. Another attorney at his firm is counsel to Staley Land Company. Since resolution of the access problem

6

places those two parties arguably at odds, he correctly withdrew from representing SF Development in the negotiations. He indicated that SF Development was already in the process of obtaining new counsel, but it would be unlikely that counsel could be hired and brought up to speed in time to close the transaction yesterday.

In light of all of the foregoing circumstances, including the late-discovered problems with the closing statement, I agreed to extend the deadline for SF Development's closing to January 4, 2010, without penalty or forfeiture. I similarly extended the deadline for 38 Amen Corner's back-up bid closing date to January 14, 2010.

Two additional points require some clarification. First, although I have extended SF Developments' closing deadline to January 4 without penalty or forfeiture, I have made no determination that, in the event that SF Development fails to close by that date, it will not be subject to penalty or the forfeiture of its deposit due to the access problem or otherwise. In other words, in the event that SF Development does not close on or before January 4, the issue of whether it is subject to penalty or forfeiture will be determined at that point.

Second, no one representing the second bidder, 38 Amen Corner, LLC, participated in the events of yesterday. Although counsel for Staley Land Company stated that 38 Amen Corner, LLC, was aware of the issues and events in the case, I

7

note that no one has entered an appearance for that entity and, as a result, it is not receiving notice of the pleadings and orders being entered in the case. Consequently, counsel for the Debtor is DIRECTED to add 38 Amen Corner, LLC, or its attorneys, to the matrix in the case. Counsel for the Debtor is further DIRECTED to serve 38 Amen Corner, LLC, or its attorneys, with a copy of the Debtor's Motion to Amend (Doc. #119), the Order Denying the Motion to Amend (Doc. #121), the Supplemental Sale Order (Doc. #122), and this Memorandum Opinion. At present, there are no pending motions relating to the sale. If any motions are filed that relate to the closing of the sale, I am prepared to hear them on January 4, 2010, at 11:00 a.m.

    IT IS SO ORDERED.

                                        /s/ Arthur B. Federman
                                            Bankruptcy Judge

Date: 12/23/2010

Attorney for debtor to serve parties not receiving electronic notice