**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 09-44526-11 |
| PREMIER GOLF MISSOURI, LLC, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

**DEBTOR'S DISCLOSURE STATEMENT**

1.    <u>INTRODUCTION</u>

Debtor filed its petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Missouri, on September 17, 2009. Debtor has continued to operate its business throughout the course of the Chapter 11 case, and has been a debtor in possession. The Debtor owns and operates the Staley Farms Golf Club which includes a 213 acre, private, non-equity, championship 18-hole golf course, a 33,000 square foot clubhouse along with a number of related facilities. The property is located at 10301 North Olive Avenue, Kansas City, Missouri 64155. The golf course is surrounded by and is integrated with an upscale residential development known as Staley Farms.

2.    <u>PURPOSE OF THIS DISCLOSURE STATEMENT</u>

Premier Golf Missouri, LLC has prepared this Disclosure Statement (the "Disclosure Statement") in connection with its solicitation of acceptances of the Debtor's Plan of Reorganization dated _____, 2010 (the "Plan") filed in the Debtor's bankruptcy reorganization case (the "Reorganization Case") under Chapter 11, Title 11, United States Code (the "Bankruptcy Code"), pending before the United States Bankruptcy Court for the Western District of Missouri, Western Division (the "Bankruptcy Court"). After a noticed hearing and by order entered  on_____, 2010, the Bankruptcy Court approved the Disclosure

Statement as containing information of a kind, and in sufficient detail as far as is reasonably practicable, that would enable a hypothetical reasonable investor typical of holders of claims of the classes being solicited to make an informed judgment whether to vote to accept or reject the Plan. The Disclosure Statement is the only document authorized by the Court to be used in connection with the solicitation of votes accepting or rejecting the Plan. The Plan is attached hereto as **Exhibit A**.

The Plan reflects the Debtor's determined effort to maintain the economic integrity of the business of the Debtor and obtain the greatest value for benefit of its creditors. The Debtor believes that creditors will receive more value under the Plan than they would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code, and that the Plan offers prospects for the highest and best recovery to creditors that can be obtained.

Your vote on the Plan is important. As a general rule, confirmation of the Plan requires acceptance by each of the voting classes. Pursuant to §1126 of the Bankruptcy Code, in order for the Plan to be accepted by a voting class, creditors holding at least two-thirds in dollar amount and more than one-half in number of claims allowed for voting purposes in such class and who actually vote to accept or reject the Plan must vote in favor of the Plan. Any class that fails to accept the Plan will be deemed to have rejected the Plan.

**THIS DICLOSURE STATEMENT IS NOT INTENDED TO REPLACE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE THEREON, BUT IS INTENDED TO AID AND SUPPLEMENT SUCH REVIEW. THE DESCRIPTION OF THE PLAN HEREIN IS A SUMMARY ONLY. HOLDERS OF CLAIMS ARE CAUTIONED TO REVIEW THE PLAN ITSELF AND ANY RELATED AGREEMENTS**

**OF TRANSACTIONS FOR A FULL UNDERSTANDING OF ITS PROVISIONS. THE DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN. THE TERMS OF THE PLAN AND ANY RELATED AGREEMENTS ARE CONTROLLING IF ANY INCONSISTENCY EXISTS BETWEEN THEM AND THIS DISCLOSURE STATEMENT.**

The following is a list of each of the Exhibits accompanying this Disclosure Statement:

EXHIBIT    A        The Chapter 11 Reorganization Plan

EXHIBIT    B        Description of various memberships offered by the Golf Club

EXHIBIT    C-1      Debtor's Pro Forma Profit Loss Statement for 2010 assuming 22,000 rounds of golf are played annually.

EXHIBIT    C-2      Debtor's Pro Forma Profit Loss Statement for 2010 assuming 25,000 rounds of golf are played annually

EXHIBIT    C-3      Debtor's Pro Forma Profit Loss Statement for 2011assuming 25,000 rounds of golf are played annually

EXHIBIT    C-4      Debtor's Pro Forma Profit Loss Statement for 2012 assuming 25,000 rounds of golf are played annually

EXHIBIT    D-1      Debtor's Profit and Loss Statement for 2007

EXHIBIT    D-2      Debtor's Profit and Loss Statement for 2008

EXHIBIT    D-3      Debtor's Profit and Loss Statement for 2009

EXHIBIT    E-1      Debtor's Balance Sheet for the year ending in 2007

EXHIBIT    E-2      Debtor's Balance Sheet for the year ending in 2008

EXHIBIT    E-3      Debtor's Balance Sheet for the year ending in 2009

EXHIBIT    F        Profit and Loss Statement for the Fitness Center for the year 2007

EXHIBIT    G        Debtor's budget explanation and assumptions

EXHIBIT    H        Discussion of the Debtor's plans to further control its expenses

| EXHIBIT | I | 2010 Membership Marketing Plan |
| EXHIBIT | J | Debtor's Membership Retention Plan |
| EXHIBIT | K | Debtor's 2010 Membership and Resident Communication Plan |
| EXHIBIT | L | Debtor's prepaid dues program for its members |
| EXHIBIT | M | Bank Midwest payoff statement dated December 30, 2009 |
| EXHIBIT | N | Table of Unsecured Creditors |

This Disclosure Statement, the Plan and all Exhibits remain subject to modification and amendment in their entirety. All financial information provided herein constitutes the best information available to the Debtor as of the date of the filing of this Disclosure Statement and remains subject to revision.

Capitalized terms used in the Disclosure Statement that are not specifically defined herein have the meanings set forth in the Plan. All Exhibits to the Disclosure Statement are incorporated by reference into and made a part of the Disclosure Statement.

**YOU SHOULD READ THE DISCLOSURE STATEMENT AND ITS EXHIBITS IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN. NO STATEMENTS OR INFORMATION CONCERING THE DEBTOR OR ANY OTHER ENTITY DESCRIBED IN THE DISCLOSURE STATEMENT OR THE PLAN, PARTICULARLY AS TO ITS FUTURE BUSINESS OPERATIONS, PROFITS, FINANCIAL CONDITIONS, ASSETS, LIABILITIES ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT.**

The financial information set forth in the Disclosure Statement has not been audited by independent certified public accountants. The Debtor is unable to represent and warrant that the information set forth in the Disclosure Statement is without any inaccuracy. To the extent

practicable, however, the information has been prepared from the Debtor's financial books and records and great effort has been made to ensure that all such information is fairly presented.

3.   PROCEDURAL INFORMATION

Under §1126 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3018(a), only creditors whose claims are deemed allowed pursuant to §502 of the Bankruptcy Code or have been allowed by an Order of the Bankruptcy Court are entitled to vote on the Plan.

Except as otherwise provided in the Disclosure Order, ballots are being sent with the Disclosure Statement to the known holders of all claims against the Debtor as of the commencement date of this case on September 17, 2009, including those that have been or will be objected to by the Debtor.  These parties may distribute the ballots to the beneficial owners of the claims as they deem necessary. The holders of claims and interest that have been objected to by the Debtor are not entitled to vote on the Plan unless otherwise ordered by the Bankruptcy Court in accordance with Federal Rule of Bankruptcy Procedure 3018(a), which provides in pertinent part, that: "Notwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan."  Additional rules governing the voting process are set forth in the Disclosure Order that accompanies the Disclosure Statement.

All pleadings and other documents referred to in the Disclosure Statement as being on file with the Bankruptcy Court are available for inspection and review during normal business hours at the Clerk of the Bankruptcy Court, 400 E. Ninth St., Kansas City, MO 64106. In addition, such pleadings and documents may be viewed on line at http://www.mow.uscourts.gov/bk_cmecf.htm using PACER access.   ANY CHANGES TO

THESE DOCUMENTS WILL BE DESCRIBED AT THE HEARING ON THE CONFIRMATION OF THE PLAN.

After carefully reviewing the Plan, the Exhibits annexed thereto, this Disclosure Statement and exhibits annexed thereto, please indicate your vote(s) with respect to the Plan on the ballot sent to you and return it by the deadline to Debtor's counsel. If you have a claim in more than one voting class, you are entitled to vote each claim. **PLEASE VOTE AND RETURN EVERY BALLOT THAT YOU RECEIVE. IN ORDER TO BE COUNTED, BALLOTS MUST BE RECEIVED BY _____, 2010.**

The Court will hold a hearing on confirmation of the Plan commencing at _____ p.m. on _____, 2010 (the "Confirmation Hearing").

THE DEBTOR BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF CREDITORS AND RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.

Dated: _____

4.      <u>BRIEF EXPLANATION OF CHAPTER 11</u>

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. It allows a business debtor to remain in operation and work out its financial difficulties. Unlike a case under Chapter 7 of the Bankruptcy Code, which automatically results in the appointment of a trustee to manage the affairs of the entity filing under the Bankruptcy Code, the debtor in a Chapter 11 case remains in control of the Estate as the "debtor in possession," generally with the same powers and duties as a trustee, unless and until a creditor's committee or other party obtains the appointment of a trustee to operate the business.

Upon filing a petition for Chapter 11 reorganization and during the pendency of a reorganization case, the Bankruptcy Code imposes an automatic stay against creditors' attempts to collect or enforce, through litigation or otherwise, claims against the debtor. The automatic stay provisions of §362 of the Bankruptcy Code, unless lifted by the court order, will generally prohibit or restrict attempts by secured or unsecured creditors or other claimants to collect or enforce any claims against the debtor that arose prior to the commencement of the Chapter 11 case.

Formulation and confirmation of a Plan of reorganization is the principal purpose of a Chapter 11 reorganization case. The Plan of reorganization is the vehicle for satisfying the holders of claims against and equity interests in a debtor. After a Plan of reorganization has been filed, the holders of claims against or interests in a debtor are permitted to vote to accept or reject the Plan. Section 1125 of the Bankruptcy Code requires the debtor, before soliciting acceptances of the proposed Plan, to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed

judgment about the Plan. The Disclosure Statement is presented to holders of Claims in impaired classes to satisfy the requirements of § 1125 of the Bankruptcy Code.

Chapter 11 does not require that each holder of a claim against or interest in a debtor vote in favor of a Plan of reorganization in order for the Bankruptcy Court to confirm the Plan. At a minimum, however, a Plan must be accepted by a majority in number and at least two-thirds in amount of those claims actually voting in at least one class of claims impaired under such Plan. In the present case, holders of claims who fail to return ballots will not be counted as either accepting or rejecting the Plan for purposes of determining whether the Plan is adopted or rejected.

Classes of claims or interests that are not "impaired" under a Plan of reorganization are conclusively presumed to have accepted the Plan of reorganization. Consequently, holders of claims or interests in such classes are not entitled to vote. Acceptances of the Plan in this case are being solicited only from those who hold claims in an impaired class. A class of claims is impaired under a Plan of reorganization unless, as set forth in § 1124 of the Bankruptcy Code, with respect to each claim or equity interest of such class, the Plan: (1) leaves unaltered the legal, equitable and contractual provision or applicable law that entitles the holder of a claim or interest after the occurrence of a default: (a) cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code other than a default of a kind specified in § 365(b)(2) of the Bankruptcy Code; (b) reinstates the maturity of such a claim or interest as such maturity existed before such default; (c) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (d) does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entities the holder of such a claim or interest;

8

or (3) provides that, on the Effective Date of the Plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to: (a) with respect to a claim, the allowed amount of such claim; or (b) with respect to an interest, if applicable, the greater of: (i) any fixed liquidation preference to which the terms of any security representing such interest entitle the holder of such interest; or (ii) any fixed price at which the debtor, under the terms of the security, may redeem such security from such holder.

Even if all classes of claims and interests accept a Plan of reorganization, the Bankruptcy Court nevertheless might not confirm that Plan. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a Plan of reorganization and, among other things, requires that a Plan of reorganization be (1) in the "best interests" of creditors and equity holders and (2) feasible. The "best interests" test generally requires that the value of the consideration be distributed under a Plan to holders of claims or interests who have not voted to accept the Plan may not be less than those parties would receive if the debtor were liquidated under a hypothetical liquidation occurring under Chapter 7 of the Bankruptcy Code. Under the "feasibility" requirement, the court generally must find that there is a reasonable probability that the debtor will be able to perform the obligations incurred under the Plan and to continue operations without the need for further financial reorganization.

If the proponent of a Plan of reorganization seeks confirmation of such a Plan under the "cramdown" provisions of § 1129(b) of the Bankruptcy Code, the Plan must meet all applicable requirements of § 1129(a) of the Bankruptcy Code (except § 1129(a)(8), which requires acceptance by all impaired classes). Among these requirements are that the Plan must (1) comply with the applicable provisions of the Bankruptcy Code and applicable law, (2) be proposed in good faith, and (3) be accepted by at least one impaired class of creditors.

The court may confirm a Plan of reorganization is "fair and equitable" as to a class if, among other things, the Plan provides: (1) with respect to secured claims, that each holder of such claim included in the rejecting class will receive or retain on account of such claim property that has a value, as of the Effective Date of the Plan, equal to the allowed amount of such claim; and (2) with respect to unsecured claims and interests, that the holder of any claim or interest that is junior to the claims or interests of such class will not receive or retain on account of such junior claim or interest any property at all unless the senior class is paid in full. The Bankruptcy Court must further find that the economic terms of the Plan of reorganization do not unfairly discriminate with respect to the particular objecting class, as provided in § 1129(b) of the Bankruptcy Code.

Other significant aspects of Chapter 11 are (1) a debtor's right and duty to seek avoidance of certain pre-petitioned or post-petitioned transfers of interests in the Debtor's Estate and (2) the right and duty of a debtor to evaluate all pre-petition executory (i.e., uncompleted) contracts (including unexpired leases) and to assume or reject such contracts.

5.      OVERVIEW OF THE REORGANIZATION CASE

The Debtor's purpose in seeking relief under Chapter 11 and in proposing a Plan of Reorganization is to pay its secured and unsecured creditors in a timely fashion. The Debtor proposes to retain its existing property and continue to operate the Golf Club and related facilities. Debtor will pay all creditors in full over time through the Plan using income the Debtor earns after confirmation of the Plan to fund Plan payments.

6.      OVERVIEW OF THE PLAN

The holders of Claims against the Debtor will be classified and receive the treatment specified in the Plan. Classification of such Claims and Interests, distributions to Claimants and

other aspects of the consummation of the Plan are discussed in greater detail in **Article 16** of the

Disclosure Statement entitled "Summary of the Plan." However, for overview purposes only, the

classification and treatment of certain secured, priority and unsecured Claims are summarized

below.

The Plan divides Claims against and Interests in the Debtor into various Classes in

accordance with the Bankruptcy Code. Secured Claims, priority unsecured Claims and non-

priority unsecured Claims are each assigned to separate Classes under the Plan. A Claim shall

receive a distribution under the Plan only if it is an "Allowed Claim" or an "Allowed Interest," as

defined in the Plan.

Administrative expenses and other Allowed Claims will be treated in a manner consistent

with the requirements set forth in the Bankruptcy Code. The holders of secured Allowed Claims,

as determined in accordance with § 506 of the Bankruptcy Code, are classified separately within

Classes 1 and 2. The holders of general unsecured Allowed Claims other than the claims of

Debtor's affiliated companies are classified as Class 3. The Claims of the Debtor's affiliated

companies are separately classified as Class 4. The claims by the members of the Golf Club are

classified as Class 5 claims. The Claims by the equity owners of the Debtor are classified as

Class 6 claims. These holders will receive the treatment specified for such Classes in the Plan.

Overtime all Allowed Claims will be paid in full.

A summary of the classification and treatment of Allowed Claims is set forth in

subsection c of **Article 16** of the Disclosure Statement entitled "Classification and Treatment of

Allowed Claims".

7.      <u>HISTORY AND BACKGROUND OF DEBTOR AND ITS BUSINESS</u>

(a)    <u>Bankruptcy Case</u>.

Debtor filed its petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Missouri, on September 17, 2009.  Debtor has continued to operate its business throughout the course of the Chapter 11 case and has been a debtor in possession.

(b)    <u>The Debtor's Property and Business</u>.

Debtor owns and operates the Staley Farms Golf Club (the "Golf Club"), which includes: a 213 acre, private, non-equity, 18-hole golf course (the "Golf Course"), along with a driving range, three putting greens, and a chipping green; a 32,731 square foot clubhouse (the "Clubhouse"), which houses the Club's pro shop; an 8,070 square foot fitness center (the "Fitness Center"); tennis courts, a swimming pool, and a playground area; and a 9,600 square foot maintenance building (the "Maintenance Building"), which houses the Club's maintenance and landscaping equipment.  The property is located at 10301 North Olive Avenue, Kansas City, Missouri 64155, and it is surrounded by upscale single-family residential properties.

The Golf Course was designed by Eric Iverson, a noted golf course designer. Construction was started in February of 2000 and completed in 2002. The Golf Course opened for play in 2002 and has been in continual use since that time. The Clubhouse, which opened in May 2006, features a lounge, bar, dining room, banquet room, kitchen, meeting room, men's and women's locker rooms, the pro shop, offices and a conference room.  The Clubhouse's lower level includes a gathering room, golf court and golf club storage, laundry rooms, an area for golf lessons and club repair, and a mechanical room.   The Fitness Center, which underwent $300,000.00 in renovations in 2007, has a large workout area, basketball court, tennis courts, a

pool and snack bar, men's and women's restrooms and locker rooms, and a spa.  These improvements were paid for by Debtor or Double O Development Company, an affiliated entity.

The Golf Course is surrounded by single family residential properties.  The master Plan for Staley Farms anticipates the sale of 750 lots.  Since sale of lots first began in 2002 a total of 258 single family lots have been sold and 34 townhomes/patio lots have been sold.  The following chart shows the sales over the years.

| Residence Sales at Staley Farms | | | |
|---|---|---|---|
| YEAR | SINGLE-FAMILY | TOWNHOME/PATIO | TOTAL |
| 2002 | 13 | 0 | 13 |
| 2003 | 25 | 2 | 27 |
| 2004 | 42 | 1 | 43 |
| 2005 | 47 | 3 | 50 |
| 2006 | 50 | 12 | 62 |
| 2007 | 43 | 10 | 53 |
| 2008 | 29 | 6 | 35 |
| YTD 2009 | 9 | 0 | 9 |
| Total | 258 | 34 | 292 |
| Average | 32.25 | 4.25 | 36.5 |
| Available for Sale | | | |
| As of 2/1/2010 | 35 | 23 | 58 |

The sales of the lots peaked in 2006 and have been falling since that time.  The successful operation of the Golf Club is an integral component of being able to sell lots in the Staley Farm residential development.  The Golf Course is an integral part of the Staley Farms residential real estate development. The Golf Club and the residential development are interdependent upon one another.  The residential lots in Staley Farms development sell at a significant premium due to the Golf Course.

(c)    Description of Golf Club's Memberships.

The Club offers a variety of memberships, including Full Golf Memberships, Associate Memberships, Corporate Memberships, Senior Memberships, Non-Resident Social

13

Memberships, and Resident Social Memberships.[1] Golf members of the Staley Farms Golf Club are those members who have purchased a golf membership. A golfing membership entitles the member (and their family if a Family Golfing Membership was purchased) to play unlimited golf, participate in all golfing events sponsored by the Golf Club (for their gender), participate in all social events (for their gender), unlimited use of the swimming pool and the Fitness Center, unlimited use of the Clubhouse for dining and rental of the Clubhouse facilities. Monthly dues for Golf members are currently set at $355 for an individual and $415 for a family membership. The initiation deposit for golf members is $17,500. Upon resignation 90% of the initiation deposit is refundable, subject to the terms and conditions of the Membership Agreement.[2] The Golf Club currently has 200 golf members. Golf Club members do not pay separate social member dues. At this current dues structure, without public play the Debtor would need approximately 240 golf members in order to break even. The Golf Club has set an upper limit on the numbers of Golf Members at 450.

Social members of Staley Farms Golf Club are principally those members who reside in Staley Farms or have purchased a social membership. A social membership entitles the social member and their immediate family to participate in all social events (for their gender), unlimited use of the swimming pool and the Fitness Center, unlimited use of the Clubhouse for dining and rental of the Clubhouse facilities. Social members presently do not have golfing privileges.

---

[1] Pursuant to the Declaration of the Homes Association all homeowners of Staley Farms are mandatory social members of the Golf Club.

[2] Under the membership agreement between the Debtor and the golf members any golf member that resigns goes on a waiting list. The initiation deposit is refunded in order of resignation at a four to one ratio until the membership of the Golf Club is full. At that point the refunds are on a one to one basis.

14

The monthly dues for Social members are either $55 per month or $75 per month. Members who pay $55.00 per month have access to the Fitness Center and its related facilities. Social members who pay $75.00 per month have in addition to access to the Fitness Center full use of the Clubhouse facility including the right to use the Clubhouse for private events. At the moment there are 208 social members with 145 of these members paying $75.00 per month for full access to all facilities. The difference concerns the level of benefits that the member desires. A more detailed description of the Golf Club's various memberships and the current pricing for services is attached hereto as Exhibit B.

Under Section 2.2 of the Rules and Regulations for the Debtor, the Debtor's public play option under normal circumstances would require a vote of the members. Given that the public play option is a provision of the Plan, this change in the contract terms made by Debtor causes the members under Class IV to be considered an impaired class of creditors under the Bankruptcy Code.

8.    GENERAL MARKET CONDITIONS FOR THE GOLF INDUSTRY

Golf courses fall into three operating classes, private (i.e. country clubs), resort (i.e. a facility associated or affiliated with a hotel or other lodging component) and public access golf courses which are open to the general public for play. In recent years and particularly during this recession it has become more common for private golf courses to introduce limited public play in order to raise additional revenues.[3] Private golf courses are supported by the members both in payment of monthly dues and by additional income generated by the member use of the restaurant, bar and other facilities offered by the private club. In 2008 there were a total of 11,581 public golf courses and 4,398 private golf courses throughout the United States.

---

[3] From December, 2009 issue of Club and Resort Magazine

According to the National Golf Foundation, "core golfers", those golfers playing eight or more rounds per year numbered 16.6 million players in the year 2008, and "casual golfers", those golfers playing one to seven rounds per year total 12 million in the year 2008. Because of general economic conditions, the number of rounds of golf played in the United States dropped from a total of approximately 501 million in 2006 to 489 million in 2008.

The private, non-equity golf course market is in the midst of a historic correction. Almost all private clubs have seen a drop in membership and total rounds since their peak. The Debtor has quite obviously not been immune from these general trends.

According to a recent survey by the National Golf Foundation at least 500 golf clubs nationwide are scrambling to raise their cash flow. Approximately 15 percent of the roughly 4,400 private clubs in the country have reported serious financial challenges. Membership at these "at-risk" clubs, as the National Golf Foundation, refers to them is down about 30 percent and 9 percent of them reported that they had tried recruiting new members with discounted initiation charges. Even among clubs that described themselves as financially healthy about on half said that they too had at least experimented with discounts. "In the last 10 years we've only seen 39 private courses close in America, but we've seen 400 open their doors a little or a lot", said Joe Beditz the president and chief executive of the National Golf Foundation.[4]  Golf Digest also reported in its August, 2009 issue that one-third of all public courses are operating at a net loss.

9.    THE DEBTOR'S FINANCIAL OPTIONS

    (a)    Liquidation.

---

[4]  Information from an article in the New York Times dated March 17, 2009.

Like other similarly-situated private clubs, the Debtor has studied options to confront the financial difficulties it is facing.  The Debtor's first option would be to simply liquidate all of its assets and close the Golf Club. Not only would this option cause the forfeiture of the members initiation deposits, but also, as further discussed in **Article 30,** generate the smallest amount of cash available to pay the creditors. The secured creditors would not be paid in full and the unsecured creditors would receive no payment at all.  Furthermore, a restrictive covenant encumbers the land upon which the golf course sits and restricts its use to open green space.[5] Accordingly there are limited options to create revenue with this property other than as a golf course.

    (b)    <u>Sale as Going Concern</u>.

The second option is to sell the Golf Club as a going concern to a third party which would continue to operate the Golf Club.  Given the current economic conditions and the current glut of golf course listed for sale in the country, it is highly unlikely that the Golf Club could be sold for an amount sufficient to pay all creditors.  Also any sale of the Golf Club would cause the forfeiture of the substantial investment that the club's golf members have made in the form of their initiation dues. The sale would also mean turning the Golf Course into a full public play facility. As was discussed earlier the Golf Course not designed for full scale public play, and turning the Golf Course into a public course would devalue the homes in the Staley Farms development.[6]

---

[5]   The restrictive covenant was part of the original zoning and platting approved by the City of Kansas City on December 15, 2000.

[6]   For example an average lot price at Shoal Creek sells for about 30% less than a similar lot in the Staley farmers development.

Financing the purchase of a golf club is extremely difficult in this current economic market. Sirius Golf Advisor, a golf course consulting and management company, (according to their website siriusgolf.com) advises "that while this is a good time to buy a golf course from a price standpoint, it is a horrible time from a financing standpoint. Banks have been battered badly by failing golf courses and most are unwilling to lend more money to new ventures. Traditional sources are demanding 40% or more equity before they will make a loan". Also there are a substantial number of golf courses for sale in the Unites States. An internet search of just two golf brokerage web sites revealed a total of 230 golf courses for sale throughout the country with siriusgolf.com listing 200 golf courses for sale and golfcoursesforsale.com listing 30 courses for sale. There are other brokerage websites that list additional courses for sale.

The internet search revealed one golf course in the Kansas City area that is up for sale. Drumm Farm Golf Course ("Drumm Farm") is located in Independence, Missouri and has an 18-hole championship golf course plus a 9 hold executive course. Drumm Farm is a well designed and maintained golf course and is currently listed for sale for $2,950,000.00. The Drumm Farm course is on 280 acres and was built in 2002. Drumm Farm is also associated with an upscale residential development, and in terms of overall quality is very similar to the Debtor. Drumm Farm has more acreage than the Debtor at 280 acres and has a more centralized location. Drumm Farm has been sitting on the market for sale for almost two years. Another golf course similar to the Debtor is the Brentwood Golf and Country Club located in White Lake, Michigan which reportedly sold this past year for $2,600,000.00. All of this information indicates to the Debtor that a sale of the Golf Club for a price sufficient to pay all of the creditors at any time in the near future is highly unlikely. After closing costs the sale of the Golf Club may not even generate enough sale proceeds to pay in full the secured claim of Bank Midwest. And at the very least no

18

sale is probable that would return the $2,247,380 that the Golf Club's members paid for membership privileges at the Golf Club. The Golf Club was built for use by residents and other golf members. The sale of the Golf Club for less than the investment by these members will destroy the Golf Club's principal purpose.

(c)    Increase Revenues Through Allowing Some Public Play.

The Debtor's third option is an option being used more and more frequently by financially strapped private golf clubs. According to the National Golf Association, in order to increase revenue many private golf clubs are opening their doors to some form of public play. Many private golf courses have done so successfully. The National Golf Association reports that after converting from private to some form of public play most clubs enjoy an increase in rounds and revenue, and conversions from private to public outnumber the closure of clubs by ten to one.

For a number of reasons the Debtor believes that some form of limited public play is a better option than full scale public play. For one thing the Golf Course is not designed to support full scale public play. The Golf Course is much better suited to support some limited public play. The typical public golf course aims to sell over 40,000 rounds per year. Public courses are designed differently to accommodate the increased play and novice golfers. For example, public course greens are built with a different variety of bent grass which can handle higher traffic levels, but which provides a lower quality playing surface. Other differences include a reduced number of bunkers, minimally contoured greens and reduced hazards and native areas.

Only about 16,000 rounds were played by the members on the Golf Course in 2009. The Golf Course has the capacity for at least 25,000 rounds annually without diminishing the quality of play and without materially increasing the Debtor's operating costs. The vast majority of the

Debtor's expenses are fixed up to the 25,000 round level of play. The Debtor expects that it can sell another 7,000 rounds through public play which will generate about $500,000 in increased annual revenue, but add only a marginal amount of additional annual expenses. Depending upon the season and day of the week, the average price for rounds at comparable courses in the area (Shoal Creek and Tiffany Greens) is $65 to $75.00 with a cart.  The Debtor's pro-forma financial projections for years 2010 through 2012 are attached hereto collectively as **Exhibit C-1 through C-4.**  As shown of the financial projections the Debtor becomes profitable at approximately 21,000 rounds of golf per year once the public play option is instituted.  The Debtor is very certain that it will pick up anywhere from 5,000 to 10,000 rounds once it opens for public play from the two closest public courses, Shoal Creek and Tiffany Springs.  Approximately 30,000 rounds of golf are played each year at Shoal Creek, and approximately 32,000 rounds per year are played at Tiffany Springs.  Staley was considered for inclusion in the Golf Digest 2009 annual ranking for America's 100 Greatest Golf Courses, and has the reputation as an excellent golf course.  The Debtor will attract golfers from all around the north of the river Kansas City metropolitan area.  On all of the golf courses in the north Kansas City metropolitan area approximately 150,000 rounds are played annually.

The Debtor's Golf Course, as a fairly new golf course that in previous years has been closed to public play, should enjoy a large number of new golfers attracted from other area courses who are eager to play a new course.  The prices for playing the Debtor's course will be comparable to those charged by the public courses in the area – approximately $75.00 for golf and cart.  As shown on the attached financial projections (Exhibits E-1 through E-6) seven thousand rounds of golf will generate an additional $500,000.00 in revenue directly, and more revenue from the sale of food, beverage and other related products and services.

10.   COMPETITION IN THE LOCAL GOLF MARKET

According to the KC Convention Bureau, more than 1,000,000 rounds of golf are played in the Kansas City metropolitan area annually.  According to the National Golf Foundation, the number of rounds played in the Kansas City metropolitan area remained stable from 2007 to 2008.  The closest private golf course to the Debtor is the National Golf Club (the "National"). The National is located in Parkville, approximately ten miles southwest of the Debtor.  National competes with the Debtor for golfers looking to belong to a private upscale country club.  The Debtor has no real competition for the quality of amenities it offers to homeowners desiring to live on the east side of the north Kansas City metropolitan area. As the real estate market recovers, this exclusivity will accelerate the Debtor's financial recovery.

As mentioned in above **Article 10** there are two public courses nearby, Shoal Creek and Tiffany Springs.  Approximately 30,000 rounds of golf are played each year at Shoal Creek, and approximately 32,000 rounds per year are played at Tiffany Springs.[7]

11.   REASONS FOR FILING BANKRUPTCY

For reasons discussed immediately below, the Club has not generated a positive cash flow for the last few years, and thus it was necessary to file for Chapter 11 bankruptcy. The Debtor's profit and loss statements for the years 2007 through 2009 are attached hereto as **Exhibit D-1 through D-3**, and the Debtor's balance sheet for the years 2007 through 2009 are attached hereto as **Exhibit E-1 through E-3**.

(a)   Drop in Members and Revenue.

---

[7] Information provided by the general managers of the two golf courses.

The current economic recession has caused a drop off of revenue. Between 2002 and the middle of 2008 the Debtor was steadily expanding its membership base. The completion of the 33,000 square foot Clubhouse in May, 2006 further accelerated the sale of memberships. The general downturn in the real estate market has had a substantial effect on the Golf Club's ability to increase its membership.  The surrounding development property is owned by Staley Land Company, LLC (hereinafter "SLC"). Sales of residences in the Staley residential development peaked in 2006, and have fallen rapidly since that time. Families who purchase lots in the Staley residential development represent the best source of new golf club members. The chart on page 12 showed SLC's sale activity of residential real estate lots in Staley Farms development the for the previous seven years.   If the Golf Course is to stay solely private, then the Golf Club needs approximately 240 golf members to break even.

Because of the economic conditions the Debtor experienced a drop off in membership from a high of 290 members to the present of number of 200 members.  Gross revenue was also down in 2009. In years 2007 through 2009 gross revenue was $2,732,565, $2,818,140 and $2,498.165 respectively.[8]

(b)    Failure of Staley Land Company, LLC to close on the purchase of the "Phase III Property".

In addition to the loss in revenue, a more significant problem was the failure by Staley Land Company, LLC ("SLC") to purchase a 38.2 acre parcel of undeveloped real property located within the Staley Farm residential development and commonly referred to by the Debtor the "Phase III Property". The Phase III Property is intended to be developed for upscale single family residential lots. The Phase III Property borders the 10th, 11th, 12th, and 13th holes on the

---

[8]  The 2009 revenue figure does not include revenue from the sale of the Phase III Property.

Golf Course. Pursuant to a real estate contract dated March 1, 2005 between Double "O" Development, LLC (an affiliate of Debtor) and SLC; SLC agreed to purchase the Phase III Property for the cash purchase price of $1,218,000 ("2005 Sale Contract"). The Phase III Property was subject to a $1 million deed of trust held by Bank Midwest, N.A. (on the Petition Date the principal balance of the Bank Midwest loan was $3,700,000). The proceeds from the sale of the Phase III Property would allow the Debtor to substantially reduce the Bank Midwest loan balance.  Although, Double O owned the property, both the Debtor and Double O were co-makers on the promissory note with Bank Midwest, and the Debtor's business operations provides the revenue to service the bank debt. With the consent of the first lien holder, prior to filing of the bankruptcy case Double O conveyed the Phase III Property to the Debtor, and contributed the equity in the Phase III Property to the Debtor for the benefit of the Debtor's estate.

The sale of the Phase III Property was supposed to close initially on September 5, 2007, but pursuant to an agreed one year extension, the sale date was extended to September 5, 2008. SLC did not close on purchase the Phase III Property in 2008, but continued to claim a right to purchase the Phase III Property under the 2005 Sale Contract. SLC filed claims against the property and litigation ensued. Because of the lawsuit the Debtor was unable to sell the Phase III Property to anyone else, forcing the Debtor to carry the additional debt load longer than anticipated. A few months prior to filing bankruptcy the Debtor engaged in mediation with SLC in an attempt to settle the dispute, but the Debtor was not able to resolve the dispute. The interest expense associated with this debt created an additional financial strain on the Debtor.  Pursuant to a court ordered auction sale held pursuant to Section 363 of the Bankruptcy Code on December 8, 2009, the Phase III Property was sold to a new buyer SF 38, LLC on December 31,

2009 for the gross sale price of $1,350,000.00.  SF Development, LLC was the high bidder at the

auction sale. The net proceeds from this sale were used to reduce the Bank Midwest debt.

      (c)    <u>Failure of SLC to pay amounts due Debtor.</u>

SLC created additional financial strain on the Debtor by its refusal to honor certain other

contractual obligations with the Debtor. Under a Development Agreement dated March 1, 2005

SLC is to pay the Debtor a fee of $4,000 for each lot sold in the Staley Farms development.  SLC

sold a total of 138 lots, but has not paid the Debtor for 42 of these lots for a total amount due of

$168,000. The last time SLC made a $4,000 lot fee payment to the Debtor was on May 9, 2008.

In connection with the Debtor's Plan, the Debtor is bringing an adversary proceeding against

SLC to recover this amount. Under the Development Agreement SLC also owes the Debtor an

additional $42,000 for reimbursement of expenses relating to the operation of the Golf Club. The

Debtor also intends to recover this sum from SLC as part of its adversary proceeding against

SLC.  The failure of SLC to honor its financial commitments with the Debtor also materially

added to the Debtor's financial problems.

12.    <u>OWNERSHIP OF THE DEBTOR</u>

The Debtor is a Missouri limited liability company formed on August 9, 2001 and is in

good standing with the Office of the Missouri Secretary of State.  As of the date of this

Disclosure Statement the Debtor's ownership structure is as follows:  KAH Legacy Holding,

LLC, a Missouri limited liability company is a 96% member of the Debtor; a third party

individual, Mark Anson, owns the other 4% of the Debtor.  KAH Legacy Holding, LLC is owned

40% by two limited liability companies controlled by Marty Ostronic, and Carla Ostronic (who

each own 40%), and 20% by the Golf Club, Inc.; the Golf Club, Inc. is a Nebraska corporation

and is owned 95% by other companies ultimately controlled by either Marty Ostronic or Carla

Ostronic and 5% by Al Hagemann. The Debtor has another affiliate, Double "O" Development, LLC, a Missouri limited liability company.  KAH Legacy Holdings, LLC is the sole and only member of Double "O" Development, LLC. The real estate comprising the Golf Course was acquired in 1999.

13.    <u>MANAGEMENT AND EMPLOYEES OF THE DEBTOR</u>

Currently the Debtor has 50 employees.  The number of employees varies. During the golf season the Debtor will have as many as 90 employees, and during the winter off season the Debtor will have about 50 employees.

Until recently, the Debtor was managed by Martin Ostronic. Neither prior to nor after the bankruptcy filing has Marty Ostronic been paid a salary or other compensation for his services.

The Debtor has recently hired Michael Montague as the General Manager for the Golf Club. Mr. Montague will take over day to day operations for the Debtor. Martin Ostronic will no longer be involved in the day-to-day business operations for the Debtor.

Mr. Montague has almost 20 years of experience in the golf industry. Before joining the Debtor, Mr. Montague was the General Manager for Lakewood Oaks Golf Club in Lee's Summit, Missouri since 2003. Mr. Montague will be paid an annual salary of $84,000. Under the terms of his employment Mr. Montague can earn a bonus of $16,000 if he meets the 2010 budget.  Mr. Montague's salary is included in the General and Administrative Expense line item on the Debtor's pro-forma financial projections. If Mr. Montague exceeds the 2010 budget he can earn an additional bonus of 10% of the profit above the budgeted profit. Creditors may obtain a copy of Mr. Montague's resume by contacting the Debtor's counsel.

The Debtor also employs the following key employees:

> Michael Montague, General Manager
> Danny Madsen, Director of Golf,
> Skip Taylor, Golf Shop Manager
> John Clouse, Course Superintendent
> Zane Patton, Assistant Course Superintendent
> Steve Maye, Assistant Course Superintendent
> Rick Schweer, Controller
> Jeff Wiltfang, Food and Beverage Manager
> Rich Babcock, Executive Chef
> Laura DeFarkas, Health & Fitness Club Manager

14.    POST PETITION ADMINISTRATION

Subsequent to filing a petition, Debtor has operated in the ordinary course of business. The Debtor negotiated an agreement with Bank Midwest for use of cash collateral conditioned upon monthly payments being to the Bank in the amount of $15,365.15, and the Debtor has made those payments each month. An Order approving the cash collateral agreement was entered on September 23, 2009 (Docket No. 22).  As was discussed in **Article 11**, the Debtor was able to sell the "Phase III Property" through an auction sale held by the Bankruptcy Court on December 8, 2009, and was also able to terminate any contractual claim made by Staley Land Company ("SLC") to purchase the Phase III Property. The winning bidder at the auction sale was SF Development, LLC which purchased the Phase III Property on December 31, 2009 for the gross sale price of $1,350,000. The net proceeds from the sale of the Phase III Property in the amount of $1,326,342.53 was paid to Bank Midwest on December 31, 2009. Pursuant to an agreement with Bank Midwest, the real estate taxes for the Debtor's real property for the year 2009 in the amount of $150,663.97 were paid out of the $1,326,342.53 in sale proceeds in January, 2010.

Since filing the Chapter 11 case, the Debtor has been able to operate successfully and pay all of its post petition obligations in the ordinary course of its business.

The Debtor also has pending a motion to assume that certain 99 year Lease dated May 5, 2005 (the "99 Year Lease") under which the Debtor is the tenant and SLC is the landlord (Docket No. 35). The 99 Year Lease is for the land and improvements comprising the Fitness Center. The Debtor acquired this lease in exchange for transferring title to the property so that the Fitness Center could be owned by the Staley Farms Home Owners Association. The purpose of this transaction was to place the Fitness Center to a not-for-profit entity, and therefore, avoid having to pay a substantial amount of real estate taxes. The Fitness Center cost almost $1.5 million to build and remodel.

SLC has alleged in a state court action filed in Circuit Court of Clay County, Missouri and filed prior to the bankruptcy filing that the Debtor was in default under the terms of the 99 Year Lease and SLC is attempting to terminate the 99 Year Lease Agreement. The default started over the demand by SLC that the Club not permit non-resident social members to use the Fitness Center. Representatives of SLC claimed that such use would provide disincentives for prospective buyers to enjoy the amenities and lifestyle of the Staley Farms residential development without buying a home. The Debtor disputed that this was a default, and obtained an injunction that enjoined the running of any applicable cure period if the court were to find a default existed. Thereafter, the Debtor was sent another notice of default regarding several minor issues such as payment of the $1.00/per year lease, naming the Landlord as an additional insured, etc. All these complaints were addressed and remedied, but SLC pressed on with its desire to terminate the 99 Year Lease. The Circuit Court for Clay County, Missouri issued another injunction against the running of the cure period. Eventually the Circuit Court granted summary judgment finding that the 99 Year Lease was neither terminated nor in default; however, the Court of Appeals remanded this decision for a determination of whether any default

was material. In any event, as of the Petition Date the lease had not been terminated by any Court Order, and the Debtor believes that the 99 Year Lease was still a legally binding agreement between the parties. To the extent there is still some alleged outstanding default, the Debtor believes it has the right to cure any such default in connection with assuming the 99 Year Lease under Section 365 of the bankruptcy Code.

The Debtor further maintains that any alleged default under the 99 Year Lease is immaterial or was cured prior to the filing of the Chapter 11 case. The Fitness Center is an integral part of the Golf Club. If the 99 Year Lease is terminated the non-resident golf members will have no access to the Fitness Center even though a portion of the Golf Members' monthly dues are used to support the Fitness Center. As part of the initial dues paid by the Golf Members, the Golf Members also expected that they would have full and continuing use of the Fitness Center as long as they remained a Golf Member. The economic impact of the Fitness Center on the Debtor is illustrated by the separate income statement for the Fitness Center which is attached as **Exhibit F**.

15.    THE REORGANIZED DEBTOR

On the Effective Date of the Plan, the Reorganized Debtor will assume and continue to own and operate the business and assets presently being operated by the debtor. The Reorganized Debtor will take all steps necessary to protect its interest in its assets and restore their value through appropriate management of the Reorganized Debtor's operations.  As was discussed in above **Article 13**, Michael Montague shall take over as the General Manager and be responsible for all day to day business operations. Martin Ostronic, through the Debtor's affiliated entities, will continue to have an equity interest in the Debtor, but in essence he will become a passive investor in the Debtor. The other key employees listed in above **Article 13** will continue to be

employed by the Debtor in their current positions. The salary expense for these employees is included in the General and Administrative Expense line item on the Debtor's pro-forma financial projections attached as Exhibits hereto.   The Debtor's pro-forma financial projections set forth in Exhibits C are the representations of the Debtor of the future financial performance of the Debtor's business. The Plan may be in effect for as long as five years since the Plan calls for the loan from Bank Midwest to fully mature in five years. The Plan however, provides that the general unsecured creditors in Class 3 shall be fully paid in approximately two years, and the Debtor shall make every effort to refinance the Bank Midwest with another financial institution after the Plan is confirmed. In fact, the Debtor has already spoken with another local bank which has expressed an interest in refinancing the Bank Midwest Debt once the Plan has been confirmed. Since the Debtor will seek to pay off the Class 2 claim as early as possible, the terms of the Plan could be fully performed in far less than five years.

MUCH EFFORT HAS BEEN MADE TO ENSURE THAT THE FINANCIAL PROJECTIONS AND THE ASSUMPTIONS ON WHICH THEY ARE BASED ARE ACCURATE AND REASONABLE. HOWEVER, NO REPRESENTATION CAN BE MADE WITH RESPECT TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THE ABILITY OF THE REORGANIZED DEBTOR TO ACHIEVE THE PROJECTED RESULTS. MANY OF THE ASSUMPTIONS UPON WHICH THE FINANCIAL PROJECTIONS ARE BASED ARE SUBJECT TO UNCERTAINTIES. SOME OR ALL OF THE ASSUMPTIONS MAY NOT MATERIALIZE, AND UNANTICIPATED EVENTS AND CIRCUMSTANCES MAY OCCUR THAT WILL AFFECT THE FINANCIAL PROJECTIONS AND THE ASSUMPTIONS ON WHICH THEY ARE BASED. ACCORDINGLY, THE ACTUAL RESULTS ACHIEVED THROUGHOUT THE PROJECTION PERIOD MAY VARY FROM

THE PROJECTED RESULTS SET FORTH IN THE FINANCIAL PROJECTIONS AND THE VARIATIONS MAY BE MATERIAL. ALL PARTIES ARE URGED TO CAREFULLY REVIEW THE FINANCIAL PROJECTIONS AND THE ASSUMPTIONS ON WHICH THEY ARE BASED BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.

16.    SUMMARY OF PLAN OF REORGANIZATION

The Debtor's Plan in its entirety is attached as Exhibit A to the Disclosure Statement. THE FOLLOWING IS A BRIEF SUMMARY OF THE PLAN.  THIS SUMMARY SHOULD NOT BE RELIED ON FOR VOTING PURPOSES.  CREDITOR IS URGED TO READ THE ENTIRE PLAN AND TO CONSULT WITH COUNSEL OR EACH OTHER IN ORDER TO FULLY UNDERSTAND THE PLAN.  THE PLAN IS COMPLEX AND REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT BY THE DEBTOR. AN INTELLIGENT JUDGMENT CONCERNING THE PLAN THEREFORE CANNOT BE MADE WITHOUT UNDERSTANDING IT.

(a)    Financial Basis for the Plan.

The Plan is based upon the belief that the present enforced liquidation value of the Debtor's assets is less than the Debtor's total indebtedness.  The Plan provides to the creditors a larger distribution than the creditors, in their respective priorities, would receive if the Debtor were to be subjected to a forced liquidation under Chapter 7 of the Bankruptcy Code. In fact, the Plan provides for full payment of all Allowed Claims.  Moreover, the Debtor will continue as an ongoing business and preserve the jobs for the employees and preserve the interest of the members who have a substantial stake not only in the Golf Club, but also in the Staley Farm neighborhood of which the Golf Course is an integral part.  Debtor therefore, believes the confirmation of the Plan would be in the best interest of the creditors and the Debtor.

Attached to the Plan are the Debtor's pro-forma financial projections for the years 2010 through 2012. The expense figures used in these financial projections are based upon the actual operating experience of the Debtor from previous years with an adjustment made for the salary of the new General Manager and the payments to be made under the Plan. The pro-forma financial projections assume in one set 22,000 rounds of golf and another set assuming 25,000 rounds of golf. In connection with the Debtor's pro-forma financial projections, attached hereto as **Exhibit G**, is Debtor's budget explanation and assumptions, along with **Exhibit H**, a discussion of the Debtor's plans to further control its expenses.

In addition to the financial projections, the Debtor has developed a marketing plan and a membership retention plan. Attached hereto as **Exhibit I** is the 2010 membership marketing plan, attached hereto as **Exhibit J**, is the Debtor's membership retention plan, and attached hereto as **Exhibit K** is the Debtor's 2010 membership and resident communication plan. Also, attached hereto as **Exhibit L,** is Debtor's prepaid dues program for its members which encourages the members to prepay their 2010 dues.

      (b)      <u>Unclassified Administrative Expenses Claims and Cure Amount</u>

Administrative Expenses Allowed Claims are treated under the Plan in the manner required by the Bankruptcy Code and, therefore, are unclassified. The Plan provides that all administrative expense Allowed Claims, which include the costs and expenses incurred in connection with the Reorganization Case subsequent to the filing date, will be paid in full in cash according to the ordinary terms under which they are incurred or, if due and not previously paid, on the Effective Date. They include all fees and costs of the Debtor's attorneys, accountants, consultants and other professionals employed at the expense of the Debtor's Estate pursuant to

Final Orders of the Bankruptcy Court.  Such fees, costs and expenses will be paid at a time and in an amount allowed by the Bankruptcy Court.

All payments to be made to authorized professionals in the Reorganization Case will be made in accordance with specific procedures established by the Bankruptcy Court relating to the payment of interim compensation and are subject to final allowance by the Bankruptcy Court. After the Confirmation Date, the Bankruptcy Court may review all previously unreviewed fees paid and to be paid to the authorized professionals and any additional requests for compensation and reimbursement of expenses.  The Bankruptcy Court may then determine the final fee and cost allowances for these authorized professionals to the extent their fees and costs need to be determined in a final fee and cost allowance.

At the present time, the Court has approved the employment by the Chapter 11 Estate of the law firm of Dunn & Davison, LLC.[9]

The Plan provides for Debtor to assume on the Effective Date all executor contracts and unexpired leases which have not been previously rejected.

(c)    Classification and Treatment of Claims.

The Plan divides the Allowed Claims of creditors and entered into six classes.

(i)    Class I Secured Claim of Bank Midwest.

Class I consists of the claim by Bank Midwest (the "Bank") which is secured by a security interest in Debtor's real and personal property.  Based upon the Bank's payoff statement received by the Debtor on December 30, 2009, and the amount received by the

---

[9] Debtor is represented by the firm of Dunn & Davison, LLC.  Pursuant to an Order entered on October 13, 2009, Application for Employment, Debtor's counsel was approved.  In connection with the filing of the Plan, Debtor's counsel will submit an Application asking the Court to approve fees and expenses incurred by counsel.  As of December 31, 2009 counsel has incurred $35,238.82 in fees and expenses in connection with the case.  All fees must be submitted and approved by the Court in connection with the fee application before any payment may be made by the Debtor.  Debtor provided Debtor's counsel with a $10,000.00 retainer as of the Petition date.  Debtor's counsel has not yet drawn upon this retainer.

Bank from the sale of the Phase 3 property, the Debtor states that the total principal amount of the Bank's secured claim as of February 1, 2010 is $ $2,719,784.06.[10]  The calculation for this claim amount is based upon the bank's payoff statement dated December 30, 2009 a copy of which is attached hereto as **Exhibit M**.  Debtor intends to pay this claim at a market rate.  Beginning on the Effective Date the Debtor will make monthly payments of interest and principal based upon a twenty five (25) year amortization schedule with interest accruing at the current prime rate plus 1% with interest adjusted annually which results in a monthly payment of $14,734.11. The loan will mature and be fully payable upon the fifth anniversary Effective Date of the Plan. The Debtor would start making these payments to the Bank on the Effective Date and each and every month thereafter unless otherwise agreed to by the Debtor and the Bank. Class I is an impaired class within the meaning of Section 1124 of the Bankruptcy Code.

    (ii)    <u>Class II Secured Claim by the City of Kansas City</u>.

Class II consists of the claim of the City of Kansas City in the amount of $201,400 which is secured by a lien on the Debtor's real estate and which is second to the

---

[10] The balance due on the Bank Midwest claim as calculated from the bank's payoff statement of December, 30 2009 with the following adjustments is as follows:

| | |
|---|---|
| Payoff Amount on 12/30/09 | $3,850,887.19 |
| Per diem for 12/31/09 | $738.12 |
| Appraisal Cost and other expenses | $28,373.40 |
| Proceeds received as of 12/31/09 | ($1,326,342.53) |
| Total loan balance as of 1/1/10 | $2,553,656.18 |
| Per diem from 1/1/10 to 1/26/10 @ $511.44 per day | $13,297.46 |
| Taxes advanced on 1/26/10 add to loan Principal Balance | $150,663.97 |
| Principal Loan Balance as of 1/26/10 | $2,704,320.15 |
| Per diem from 1/27/10 to 1/31/10 @ $541.62 per day | $2,166.46 |
| Total Interest due as of 1/31/10 = $2,166.46 + $13,297.46 | $15,463.92 |
| Total Principal Balance as of 1/31/10 | $2,704,320.15 |
| Total loan balance including interest as of 2-01-10 | $2,719,784.06 |

Deed of Trust lien held by the Bank.  This claim will be paid in full in accordance with the terms of the Settlement Agreement dated April 30, 2009 and entered into by and between the Debtor and the City of Kansas City.  The Settlement Agreement calls for a payment to be made in the amount of $50,000.00 on July 31, 2010, and on the 31st day of July of each year through 2013. The payments to the Class II creditor are shown on the Debtor's pro-forma financial projections. Since none of the terms of the Settlement Agreement are being affected by the Plan, the Class II creditor is not an impaired class within the meaning of Section 1124 of the Bankruptcy Code.

    (iii)    <u>Class III General Unsecured Claims Without Priority</u>.

Class III consists of all unsecured claims not entitled to any priority.  Class III claims shall be paid in cash 100% of their allowed amount without interest as follows: The Debtor will make a distribution in the total sum of $15,000 on a pro-rata basis to the Class III creditors ninety days after the Effective Date and the same $15,000 distribution every quarter thereafter until the Class III creditors are paid in full. The scheduled sum of the Class III creditors is $122,582, but based upon conversations with some of these creditors, the Debtor believes that the actual Allowed amount of the allowed Class III Claims will be slightly less than the scheduled amount.[11]  The Debtor's pro-forma financial projections show a $5,000 monthly expense item to budget for the payment of these claims. Class III is an impaired class within the meaning of Section 1124 of the Bankruptcy Code.

    (iv)    <u>Class IV Unsecured Contingent Claims of Golf Members</u>.

---

[11] Please see **Exhibit N** for a list of the Class III creditor claims

Class IV consists of the Unsecured Contingent Claims of the golf members. Class IV is an impaired class within the meaning of Section 1124 of the Bankruptcy Code. The Class IV creditors will be paid in accordance with the refund provisions of the Membership Agreement (as discussed in above Article 7(c)). Class IV is an impaired class within the meaning of Section 1124 of the Bankruptcy Code.

      (v)    <u>Class V Unsecured Claims of Affiliates</u>.

Class V consists of the claims of the Debtor's affiliated entities (Double O, $574,364.00 and KAH Legacy Holding, Co., $954,565.00). No payments will be made on the Class V Claims until after the claims of Classes I, II and III are paid in full. Class V is an impaired class within the meaning of Section 1124 of the Bankruptcy Code, but the Class V claims will not be eligible to vote on the Plan.

      (vi)    <u>Class VI Interest of the Member and Owner of Debtor</u>.

Class VI consists of the interest of the member and owner of Debtor. This interest will not be modified by the Plan.

17.    <u>EXECUTORY CONTRACTS</u>

All executory contracts and unexpired releases that are not specifically rejected by the Debtor prior to confirmation of Plan, or for which the Debtor has not applied to the Court for permission to reject prior to confirmation, or which have not been rejected pursuant to the terms of the Plan, will be assumed. In particular, the Golf Course Development Agreement dated March 2, 2005 will be assumed. Debtor reserves the right to reject executory contracts any time prior to confirmation.

18.    <u>MEANS FOR EXECUTION OF THE PLAN</u>

      (a)    <u>Cash flow from business operations</u>.

The Debtor will execute the Plan through a continuation of its operations as contemplated under the Plan. The operation of Debtor's business is expected to generate sufficient cash to pay fully all Claims that are to be paid by or on the Effective Date, and all creditors will be paid in full over an extended period of time from the Debtor's operating revenue in accordance with the Plan.

     (b)    <u>Line of Credit</u>.

In order to allow the Debtor some financial flexibility and provide some additional working capital the Debtor has obtained a commitment from Mark Anson (who owns a four percent equity interest in the Debtor) for a revolving line of credit in the maximum principal amount of $100,000 (the "Line of Credit"). The Line of Credit shall be secured by a third position deed of trust on the Debtor's real property. The terms of the Line of Credit provide interest to accrue at the fixed rate of 8% per annum. The Line of Credit shall mature and be fully due and payable on the second anniversary of the Effective Date. All accrued interest on the outstanding balance of the Line of Credit shall be payable on a monthly basis until the maturity date.

19.    <u>VOTING ON ACCEPTANCE OR REJECTION OF THE PLAN AS GOVERNED BY THE PROVISIONS OF THE BANKRUPTCY CODE</u>

Each voting creditor will be supplied with an official ballot in the form prescribed by the bankruptcy court. Creditors may vote to accept or reject the Plan by filing a completed ballot with the clerk of the bankruptcy court. A class of creditors will be considered to have accepted the Plan, (1) if accepted by creditors holding at least two thirds an amount and more than one half in number of the Allowed Claims as such class that have voted; or (2) if the class is unimpaired within the meaning of the Bankruptcy Code.

After time for voting on the Plan passes, the bankruptcy court will hold a hearing and rule on confirmation of the Plan in accordance with the Bankruptcy Code.  If all requirements for confirmation of Plan under the Bankruptcy Code are satisfied except that the Plan is not accepted by the creditors, the bankruptcy court may confirm the Plan without acceptance of creditors if the court finds that the Plan does not discriminate unfairly, and is fair and equitable within the meaning of the bankruptcy code with respect to any class of creditors that does not accept the Plan.

20.    TREATMENT OF EQUITY INTEREST HOLDERS

The holder of equity interests in Debtor shall retain its equity interests in shares of stock in the Reorganization Debtor equal to the number of shares of stock it held in Debtor prepetition.

21.    REORGANIZED DEBTOR AND THE DESIGNATION OF ALLOWED CLAIMS AND DISPUTED CLAIMS

On and after the Effective Date, the Reorganized Debtor will make all distributions under the Plan required to be made by the Reorganized Debtor to or for the benefit of the holders of Allowed Claims.

Pursuant to § 1123(b)(3)(B) of the Bankruptcy Code, the Reorganized Debtor may investigate, file, enforce, exercise, abandon, prosecute, adjust, settle or compromise all Claims, proceedings, rights and causes of action of the Debtor and its Estate, other than Claims, proceedings, rights and causes of action that have been waived, released, compromised or settled under or in connection with the Plan or otherwise. After the Effective Date, the Reorganized Debtor reserves its right to pursue any avoidance actions under §§ 544, 545, 547, 548, and 549 of the Bankruptcy Code.

All proceedings relating to the allowance, disallowance, subordination or estimation of Claims will be diligently investigated, filed, enforced, exercised, abandoned, adjusted, settled or compromised by the Reorganized Debtor at its sole cost and expense.

Each and every holder of an Allowed Claim that elects to participate in the distributions provided for under the Plan represents and warrants to the Debtor that such holder is authorized to accept in consideration of such Allowed Claims the distributions provided for under the Plan and that there are no outstanding commitments, agreements or understandings, express or implied, that may, or shall, in any way defeat or modify the rights conveyed or released or obligations undertaken under the Plan.

22.    REVERTING OF PROPERTY AND DISCHARGE OF CLAIMS

(a)    Reverting of Property and Assumption of Business: Substantial Consummation.

On the Effective Date, all property of the Debtor and its Estate shall revert to the Reorganized Debtor free and clear of any and all Liens, except liens of secured creditors, Claims, encumbrances or restrictions, and the Reorganized Debtor shall assume the businesses of the Debtor and its Estate, except as otherwise provided in the Plan or the Confirmation Order. The Reorganized Debtor will thereafter operate the business and may use, sell, acquire, lease or otherwise dispose of its property in accordance with the Plan and the Confirmation Order, but otherwise shall be free of any restrictions imposed by the Bankruptcy Court, the Bankruptcy Code, the Bankruptcy Rules or the Office of the United States Trustee.

Substantial consummation of the Plan within the meaning of the Bankruptcy Code shall have occurred on the Effective Date when the Reorganized Debtor has assumed the business of the Debtor and its Estate and the distributions under the Plan have commenced in the manner provided in the Plan and the Confirmation Order.

(b)    <u>Discharge of Claims and Debts</u>.

Except as otherwise expressly provided in the Plan, the Confirmation Order or any Final

Order with respect to any particular Allowed Claim made pursuant to an agreement or stipulation

entered into by the Debtor and the holder of that Allowed Claim, the entry of the Confirmation

Order shall, on the Effective Date, discharge and release the Debtor and its Estate from any and

all Claims, debts and Liens that arose before the Confirmation Date and any and all Claims and

debts of the kind described in §§ 502(g), 502(h) or 502(l) of the Bankruptcy Code, including, but

not limited to, any Claim or debt based on a deficiency, whether or not:

    i.   A Proof of Claim based on such Claim or debt is filed or deemed filed under §

       1111(a) of the Bankruptcy Code;

    ii.  Such Claim or debt is an Allowed Claim; or

    iii. The holder of such Claim or debt has accepted the Plan.

The confirmation of the Plan does not discharge the Debtor from any debt excepted from

discharge under 11 U.S.C. § 523.

(c)    <u>Effect of Discharge</u>

The discharge and release provided for under the Plan shall have the effects set forth in

the Bankruptcy Code, including, but not limited to:

    i.   Voiding any judgment obtained against the Debtor on any discharged Claim

       or debt;

    ii.  Operating as an injunction against the commencement or continuation of any

       action, employment or process or any act to collect, recover or offset any

       discharged Claim or debt; and

iii. Operating as injunction against the commencement or continuation of any action, the employment of process or any act to collect, recover or offset any Claim or debt against any property of the Debtor or its Estate, except as otherwise permitted by the Plan or the Confirmation Order.

23.   <u>JURISDICTION OF THE BANKRUPTCY COURT</u>

Section 11.1 of the Plan provides that, after the Confirmation Date and after the Effective Date, the Bankruptcy Court will retain the authority and jurisdiction as is allowed under Title 28 of the United States Code, the Bankruptcy Code or other applicable law. Section 10.1 further describes a number of specific matters and proceedings with respect to which the Bankruptcy Court will continue to have jurisdiction, including, but not limited to, (1) proceedings relating to Claims, Interests or rights in, Liens on or title to property the Debtor or its Estate; (2) the enforcement, interpretation or modification of the Plan, the Confirmation Order or any document, instrument, agreement or action undertaken in connection with the Plan or the Confirmation Order or any order entered in the Reorganization Case before or after the Effective Date; (3) taxed, tax refunds, tax attributes and tax benefits and similar related matters with respect to the Debtor, its Estate or the Reorganized Debtor arising prior to the Effective Date or relating to the period of administration of the Reorganized Case; and (4) applications for compensation or reimbursement of expenses incurred before or after the Effective Date, to the extent provided under the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Confirmation Order.

24.   <u>CONDITIONS TO THE EFFECTIVENESS OF THE PLAN</u>

(a)      <u>Conditions</u>.

The following conditions must occur and be satisfied on or before the Effective Date for the Plan to be effective on the Effective Date:

     i.   The Confirmation Order shall have been signed by the Bankruptcy Court and duly entered on the docket for the Reorganization Case by the Clerk of the Bankruptcy Court in form and substance acceptable to the Debtor;

     ii.   There shall not be any stay in effect with respect to the Confirmation Order;

     iii.   The Confirmation Order shall be a Final Order; and

     iv.  The Plan shall have been approved by the Bankruptcy Court.

     (b)    <u>Waiver of Conditions</u>.

The conditions set forth above in paragraphs 1.b. and 1.c. may be waived or modified in whole or in part by the Debtor. The conditions set forth above in paragraphs 1.a. and 1.d. may not be waived or modified in whole or in part by the Debtor.

25.    <u>MISCELLANEOUS PROVISIONS</u>

     (a)    <u>Dates on which Distributions are Made</u>.

All distributions under the Plan to be made to or for the benefit of the holders of Allowed Claims shall be made by the Reorganized Debtor to or for the benefit of the holders of Allowed Claims as and when due in the manner set forth in the Plan, or as soon thereafter within 30 days as is practicable.

All distributions to be made by the Reorganized Debtor to the holders of Allowed Claims shall be made by checks.

     (b)    <u>Modification of the Plan</u>.

The Plan may be altered, amended or modified only by the Debtor before, on, or after the Confirmation Date pursuant to § 1127 of the Bankruptcy Code. The Plan may not be altered,

amended, or modified without the written consent of the Debtor or Order of the Bankruptcy Court, as the case may be.

      (c)    <u>Addresses for Distributions to the Holders of Allowed Claims</u>.

Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, distributions to be made under the Plan by Debtor to the holders of Allowed Claims shall be made by first class United States mail, postage prepaid, to the latest mailing address set forth in a Proof of Claim timely filed with the Bankruptcy Court by or on behalf of the holders of the Allowed Claim or, if no such Proof of Claim has been timely filed, the mailing address set forth in the Schedules of Assets and Liabilities filed by the Debtor in the Reorganization Case, as amended. It is the duty and responsibility of each holder of an Allowed Claim entitled to participate in distributions under the Plan to notify the Debtor of its most recent address. The Debtor is not required to make any other effort to locate or ascertain the address of the holder of any Allowed Claims.

      (d)    <u>Cramdown</u>.

If any impaired Class under the Plan fails to vote to accept the Plan, the Debtor has reserved the right to request that the Bankruptcy Court find that the Plan does not discriminate unfairly and is fair and equitable with respect to each such impaired Class, and confirm the Plan pursuant to § 1129(b) of the Bankruptcy Code.

26.    <u>RISK ANALYSIS</u>

The following is intended to be a summary of certain material risks associated with the Plan and the Reorganized Debtor, but is not exclusive. Each creditor should analyze and evaluate the Plan and the risks and the other information set forth in this Disclosure Statement as a whole with its, his, or her advisors in determining whether to vote to accept or reject the Plan.

42

(a)    <u>Inherent Uncertainty in the Financial Projections</u>.

The projections set forth in **Exhibits C-1 through C-6** to this Disclosure Statement represent the best possible prediction of future events based on certain assumptions set forth with such projections. These future events may or may not occur, and the projections may not be relied upon as guarantee, representation or other assurance of the actual results that will occur. Because of the numerous risks and inherent uncertainties that will affect the operations of the Reorganized Debtor, the actual results of the Reorganized Debtor may be different from those projected, and such differences may be material and may adversely affect the Reorganized Debtor and its operations.

(b)    <u>Tax Consequences</u>.

Consumption of the Plan may have significant tax consequences that may adversely affect the Reorganized Debtor and certain creditors. See Section IV below.

(c)    <u>Other Factors</u>.

In addition, other issues unidentified or unquantified at the present may adversely affect the Reorganized Debtor.

27.    <u>TAX CONSEQUENCES OF THE PLAN</u>

(a)    <u>Introduction</u>.

**THE DEBTOR BELIEVES THAT EACH HOLDER OF A CLAIM SHOULD DISCUSS ANY POTENTIAL INCOME TAX CONSEQUENCES OF THE PLAN WITH COMPETEN TAX COUNSEL IN ORDER TO FULLY UNDERSTAND THE TAX IMPACT OR POTENTIAL IMPACT OF THE PLAN ON SUCH HOLDER OF A CLAIM OR INTEREST.**

(b)    <u>Federal Taxes</u>.

A summary description of certain United States ("U.S.") federal income tax consequences of the Plan is provided below. The description of tax consequences below is for informational purposes only and, due to lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various U.S. federal income tax consequences of the Plan as discussed herein. Only potential material U.S. federal income tax consequences of the Plan to the Debtor are described below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan, and no tax opinion is being given in this Disclosure Statement. No rulings or determinations of the Internal Revenue Service (the "IRS") or any other tax authorities have been obtained or sought with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such authorities. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Debtors or to any particular holder of claims or Interests. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of the U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated and proposed thereunder, judicial decisions, and administrative rulings and pronouncements of the IRS and other applicable authorities, all as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations enacted or promulgated in the future could alter or modify the analyses and conclusions set forth below. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained herein would affect the tax consequences to the holders of claims or Interests.

Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences discussed below.

The Plan may modify or affect the timing of the federal income tax treatment of Claims. The Plan is not a plan that proposes to pay less than 100% of Allowed Claims to any claimant. Accordingly, it is not anticipated that the Debtor will have cancellation of debt issues with respect to Federal income tax consequences, and to the best of the knowledge, information and belief of Debtor's representatives there are no known material Federal tax consequences of the Plan to the Debtor.

THIS DISCUSSION DOES NOT ADDRESS FOREIGN, STATE OR LOCAL TAX CONSEQUENCES OF THE PLAN, NOR DOES IT PURPORT TO ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO SPECIAL CLASSES OF TAXPAYERS (SUCH AS FOREIGN ENTITIES, NONRESIDENT ALIEN INDIVIDUALS, PASS-THROUGH ENTITIES, S CORPORATONS, MUTUAL FUNDS, INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, SMALL BUSINESS INVESTMENT COMPANIES, REGULATED INVESTMENT COMPANIES, CERTAIN SECURITIES TRADERS, BROKER-DEALERS AND TAX-EXEMPT ORGANIZATIONS). FURTHERMORE, ESTATE AND GIFT TAX ISSUES ARE NOT ADDRESSED HEREIN AND TAX CONSEQUENCES RELATING TO THE ALTERNATIVE MINIMUM TAX ARE GENERALLY NOT DISCUSSED HEREIN.

DEBTOR MAKES NO REPRESENTATION NOR RENDERS ANY OPINION AS TO WHAT THE INCOME TAX CONSEQUENCES WILL BE OR ARE LIKELY TO BE IN THE CASE OF CONFIRMATION OF THE PLAN TO ANY CREDITOR. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING

ON A HOLDER'S PARTICULAR CIRCUMSTANCES. EACH MEMBER OF EACH CLASS
IS SOLELY RESPONSIBLE FOR DETERMINING THE FEDERAL INCOME TAX
CONSEQUENCES APPLICABLE TO ITS OWN CIRCUMSTANCES. CREDITORS ARE
ADVISED TO CONSULT WITH THEIR TAX ADVISORS CONCERNING THE
INDIVIDUAL TAX CONSEQUENCES OF THE PLAN AS IT AFFECTS THEIR
PARTICULAR CLAIM OR INTEREST, INCLUDING THE U.S. FEDERAL, STATE, LOCAL
AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN
AND IN THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD
KEEPING REQUIREMENTS. NO OPINION OF TAX COUNSEL HAS BEEN SOUGHT
AFTER OR OBTAINED IN CONNECTION WITH THIS DISCLOSURE STATEMENT. THE
STATEMENTS CONTAINED HEREIN ARE ONLY GENERAL OBSERVATIONS AND
ARE NOT TO BE INTERPRETED OR CONSTRUED AS LEGAL ADVICE.

THE IRS REQUIRES WRITTEN ADVICE REGARDING ONE OF MORE U.S.
FEDERAL TAX ISSUES TO MEET CERTAIN STANDARDS. THOSE STANDARDS
INVOLVE A DETAILED AND CAREFUL ANALYSIS OF THE FACTS AND APPLICABLE
LAW WHICH HAVE NOT BEEN ASKED TO MAKE THAT TYPE OF ANALYSIS IN
CONNECTION WITH ANY ADVICE GIVEN IN THE FOREGOING DISCUSSION. AS A
RESULT, WE ARE REQUIRED TO ADVISE YOU THAT ANY U.S. FEDERAL TAX
ADVICE RENDERED IN THE FOREGOING DISCUSSION IS NOT INTENDED OR
WRITTEN TO BE USED AND CANNOT BE USED FOR THE PURPOSE OF AVOIDING
PENALTIES THAT MAY BE IMPOSED BY THE IRS.

28.    ALTERNATIVES TO THE PLAN

The Debtor believes the Plan provides Claimants with the greatest possible value that can be realized on their Allowed Claims and recommends that you vote to accept the Plan. In the event that the Plan is not confirmed, the alternatives for creditors include the filing of another plan by Debtor or another party-in-interest, conversion of the Chapter 11 proceeding to Chapter 7 liquidation, or dismissal of the case. Each of the foregoing alternatives is discussed below.

29.    LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

(a)    Description.

Alternatively, a liquidation of the Debtor could be conducted. For the reasons set forth below, the Debtor believes that the distributions to Allowed Claims under the Plan will be greater than the distributions that might be received after a liquidation of the Debtor pursuant to Chapter 7 of the Bankruptcy Code. To calculate what member of each Class of Claims and Interests would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the dollar amount that would be generated from the liquidation of the Debtor (the "Gross Liquidation Value").

As set forth in the Liquidation Table below, the Gross Liquidation Value must be reduced by the costs of the Chapter 7 liquidation in order to ascertain the possible distributions to holders of Claims and Interests. The Debtor's costs of liquidation under Chapter 7 would likely include at least the following: (1) the fees and expenses of the Chapter 7 trustee, as well as those of counsel and other professionals that might be retained by the Chapter 7 trustee; and (2) commissions and selling expenses. These Allowed Claims, and such other Allowed Claims as might arise in the Chapter 7 liquidation or result from the Reorganization Case, such as tax Allowed Claims, would be paid in full out of the proceeds from a Chapter 7 liquidation before

the balance would be made available to make a distribution on account of non-priority unsecured Allowed Claims.

In determining the likely distributions to the holders of Allowed Claims in a Chapter 7 liquidation case, the Bankruptcy Court will also consider whether, and to what the extent, the Allowed Claims in a Chapter 7 liquidation would be greater than would be the case if the Plan were confirmed, thereby significantly diminishing the recovery of all unsecured creditors in the Chapter 7 liquidation scenario. Additionally, in any Chapter 7 liquidation case, the Bankruptcy Court would have to determine the extent, priority and possible subordination of various Classes of Claims. These issues could result in litigation and Claims that would both delay and reduce substantially the distribution to creditors in any Chapter 7 liquidation case.

The starting point for determining Gross Liquidation Value is determining the liquidation value of the Debtor's assets. In the event of a liquidation of the assets of the Debtor, either under Chapter 7 or by the secured creditors themselves, if the case were dismissed and they proceed to foreclose against their collateral, there would be no chance of any excess value to be available for unsecured creditors or holders of tax penalty Claims.

After considering the effect that a Chapter 7 liquidation is likely to have on the net value of the Debtor's assets, including the adverse effect of a forced sale on the prices obtained for the Debtor's assets, the costs and expenses of a Chapter 7 liquidation, the likely increase in Claims against the Debtor in a Chapter 7 case, and the delay in the distribution, the Debtor has determined that no material liquidation proceeds would be available for distributions to creditors other than the secured creditors. The Liquidation Table below reflects the Debtor's computations of the result of a liquidation.

       (b)    <u>Liquidation Table</u>

The Debtor estimates the value of its properties, and therefore the value of the secured

Claims as follows:

### PREMIER GOLF MISSOURI, LLC
### LIQUIDATION ANALYSIS

| Assets | Liquidation Value with Assets Sold Separately | Liquidation Value if Sold as a Golf Course[8] |
|---|---|---|
| Land[1] | $213,000[1] | |
| Club House[2] | | |
| Membership Accounts | | |
| Receivable[3] | $170,260 | |
| Fixtures Furniture | | |
| and Equipment[4] | | |
| Club House | $140,000 | |
| Fitness Center | $29,000 | |
| Golf Course Machinery | $22,000 | |
| Maintenance | $20,000 | |
| Pumps | $30,000 | |
| Golf Carts [5]   $57,600 | | |
| Other Vehicles [6] | | |
| Other Receivables[7] | $262,598 | |
| **Total Assets** | $1,993,598 | $2,655,000 [8] |

Footnotes:

1   The land comprising the Golf Course is subject to a deed restriction which states that the land cannot be developed and can only be used as a golf course, a park or some other green space.

2   Based upon the assumption that the Golf Club would be sold as a going concern to a third party which intends to continue operating the Golf Club and includes the land, buildings, all improvements and all personal property. The Clubhouse at $1 million assumes that the Clubhouse can be sold as a restaurant or private club facility apart from the residential real estate development

3   Based upon Member accounts receivables being 90 days or less old as of February 1, 2010

4   Based upon the liquidation value estimated to be 25% of book value as shown on the Debtor's Dec. 31, 2009 balance sheet.

5   72 golf carts with a liquidation value of $800 each

6   Two trucks at $5,000 each

7   Includes claims against third parties including approx.  $228,000 in claims against Staley Land Company.  Since these claims must be pursued through litigation, the collectability is uncertain.

8   Based upon the value of the Drumm Farm sale listing of $2,950,000 (a comparable golf course) less 10% closing fees and administrative costs. See Article 9 of the Disclosure Statement for a description of the Drumm Farm property.

30.    <u>DISMISSAL</u>

Dismissal of the case would have the effect of restoring (or attempting to restore) all parties to their status prior to the filing of the Reorganization Case. The likely consequence of a dismissal is the institution of foreclosure proceedings by one or more of the secured creditors and lawsuits by unsecured creditors who would then attempt to levy on the Debtor's assets. These foreclosures would terminate the Debtor's business operations and virtually assure all other creditors of a zero distribution on their debts. Therefore, the Debtor believes that dismissal of the case is not a viable alternative to the Plan.

31.    <u>CONFIRMATION REQUIREMENTS</u>

At the hearing on the confirmation of the Plan, the Bankruptcy Court will confirm the Plan only if the requirements of the Bankruptcy Code, particularly those set forth in §1129, have been satisfied.

32.    <u>ACCEPTANCES NECESSARY TO CONFIRM THE PLAN</u>

At the hearing on the confirmation of the Plan, the Bankruptcy Court must determine, among other things, whether the Plan has been accepted by the requisite amount and number of Allowed Claims in each impaired Class. Under the Bankruptcy Code, a Class of creditors is impaired if their legal, equitable or contractual rights are altered by a proposed Plan of Reorganization. If a Class is not impaired, each creditor in such unimpaired Class is conclusively presumed to have accepted the Plan pursuant § 1126(f) of the Bankruptcy Code. All Classes are impaired under the Plan and holders of Allowed Claims in such Classes are entitled to vote for or against the Plan by completing and returning the ballots mailed to them with the Disclosure Statement in the manner set forth in the ballots.

Under § 1126 of the Bankruptcy Code, an impaired Class of creditors and each holder of a Claim in such Class will be deemed to have accepted a Plan if the holder of at least two-thirds in amount and more than one-half in number of the Allowed Claims in such impaired Class for which completed ballots have been received have voted for acceptance of the Plan. An impaired Class of equity Interests and each holder of an Interest in such Class will be deemed to have accepted a Plan if the Plan has been accepted by at least two-thirds in amount of the Interests in such Class who actually vote on the Plan.

If all impaired Classes under the Plan do not accept the Plan, the Debtor intends to request the Bankruptcy Court to confirm the Plan pursuant to § 1129(b) of the Bankruptcy Code. To confirm the Plan under § 1129(b) of the Bankruptcy Code, the Bankruptcy Court must determine, among other things, that the Plan does not discriminate unfairly and that it is fair and equitable with respect to each Class of impaired Allowed Claims that have not voted to accept the Plan.

33.    <u>BEST INTEREST OF CREDITORS</u>

To satisfy one of the requirements necessary for confirmation of the Plan, the Debtor must establish and the Bankruptcy Court must find that, with respect to each Class of Allowed Claims under the Plan, each holder of an Allowed Claim in that Class either has accepted the Plan or will receive or retain under the Plan on account of such Allowed Claims property of a value that is at least the amount that such holder would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. Section VII.A. of this Disclosure Statement entitled "Liquidation Under Chapter 7 of the Bankruptcy Code" contains the Debtor's analysis of the likely results of a Chapter 7 liquidation of the Debtor. The Bankruptcy must compare the value of the distributions that would be made to each Class in a Chapter 7 liquidation case to the value

51

of the distributions to each Class under the Plan to determine if the Plan is in the best interest of each Class of Allowed Claims. THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTEREST OF THE HOLDERS OF ALL ALLOWED CLAIMS AND PROVIDES VALUE TO ALL OF THEM AT LEAST IN THE AMOUNTS THEY WOULD RECEIVE IN A CHAPTER 7 LIQUIDATION CASE OF THE DEBTOR.

34.    FEASIBILITY

As a condition to confirmation of the Plan, the Bankruptcy Code requires the Bankruptcy Court to determine that confirmation is not likely to be followed by liquidation of the Reorganized Debtor or the need for its further financial reorganization. For purposes of determining whether the Plan meets this "feasibility" standard, the Debtor has projected the ability of the Reorganized Debtor to meet its obligations under the Plan and to continue operations. As shown in the Debtor's pro-forma financial projections (**Exhibit C-1 through C-4**) the Reorganized Debtor will be able to meet its obligations under the Plan.

The Debtor believes that the results set forth in the financial projections are reasonable and attainable by the Reorganization Debtor and that the Reorganized Debtor will have sufficient funds available to operate and meet the obligations under the Plan. Much effort has been made to ensure that the financial projections and the assumptions on which they are based are reasonable. The Debtor cautions, however, that no representations can be made by the Debtor with respect to the accuracy of the financial projections or the Reorganized Debtor's ability to achieve the projected results. Many of the assumptions on which the financial projections are based are subject to major uncertainties. Some assumptions inevitably will not materialize and unanticipated event may affect the actual financial results. Therefore, the actual results achieved

throughout the projection period will vary from the projected results and the variations may be material.

HOLDERS OF CLAIMS AGAINST THE REORGANIZED DEBTOR SHOULD CAREFULLY READ AND CONSIDER THE FACTORS SET FORTH ABOVE AS WELL AS OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THE REORGANIZATION DEBTOR'S ABILITY TO MAKE DISTRIBUTIONS IN ACCORDANCE WITH THE PLAN IS BASED ON THE REORGANIZED DEBTOR'S ABILITY TO EARN FUNDS FROM THE BUSINESS COMPARABLE TO THE PREVIOUS FIVE (5) YEARS' EARNINGS. THE DEBTOR BELIEVES THAT THE PLAN IS FEASIBLE, AND THE DEBTOR URGES THE HOLDERS OF ALL ALLOWED CLAIMS VOTING ON THE PLAN TO VOTE TO ACCEPT THE PLAN.

**THE DEBTOR**

PREMIER GOLF MISSOURI, LLC

By: Staley Golf, LLC, Member

By: */s/ Martin P. Ostronic*
By: Martin P. Ostronic
Title: Member